Filed 2/2/26  P. v. Parra CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARIO JAVIER PARRA,<br><br>Defendant and Appellant. | F086372<br><br>(Super. Ct. No. CR-19-000322)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy A. Leo, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Mario Javier Parra was convicted by jury of the willful, deliberate, and premeditated attempted murder of Omar Castaneda (Pen Code,[1] §§ 664, 187, subd. (a); count 1); the attempted voluntary manslaughter of Jovina Mendoza (§§ 664, 192, subd. (a); count 2); discharging a firearm at an occupied motor vehicle (§ 246; count 3); two counts of first degree robbery (§ 212.5, subd. (a); counts 4 & 5); active participation in a criminal street gang (§ 186.22, subd. (a); count 7); being a felon in possession of a firearm (§ 29800, subd. (a)(1); counts 8 & 10); and unlawful possession of ammunition (§ 30305, subd. (a)(1); counts 9, 11 & 12). The jury also found true gang enhancements (§ 186.22, subd. (b)(1)) as to counts 1 through 5 and 8 through 11. It also found true firearm use enhancements under section 12022.53, subdivisions (d) and (e)(1) as to counts 1 through 3, based on a principal's personal and intentional discharge of a firearm causing great bodily injury, and subdivision (b) as to counts 4 and 5.[2] Parra was sentenced to an aggregate term of 25 years to life in state prison plus a determinate term of 20 years eight months.[3]

Parra raises multiple claims on appeal. First, he contends the trial court erred in denying his *Batson/Wheeler*[4] motion, challenging the prosecutor's use of peremptory challenges against two jurors based on their sexual orientation. Second, he argues that the gang enhancements and the substantive gang offense must be reversed considering

---

[1] All further undefined statutory citations are to the Penal Code.

[2] Parra was tried jointly with codefendant Carlos Alejandro Armenta Bautista, Jr., who alone was charged with making criminal threats (§ 422, subd. (a); count 6). Bautista is not a party to this appeal.

[3] The reporter's transcript reflects the trial court imposed consecutive terms totaling 20 years plus 25 years to life, although at one point the court stated the aggregate term imposed was "22 years, eight months plus 25-to-life." The discrepancy, which is also reflected on the abstract of judgment, appears to result from a clerical error in calculating the aggregate determinate term. Because we conclude the matter must be remanded for a full resentencing hearing, we need not order correction of the record.

[4] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

the amendments to section 186.22 enacted by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333). Third, he asserts the trial court erred by instructing the jury on the kill zone theory of attempted murder. Fourth, he contends there is insufficient evidence to support his conviction for attempted voluntary manslaughter. Fifth, he claims the court erred by failing to instruct the jury on accomplice liability (CALCRIM No. 335) for counts 8 through 11. Sixth, he argues the prosecutor committed misconduct during her comments in closing argument. Seventh, he contends the court's rulings improperly prevented him from impeaching a key prosecution witness with the witness's prior inconsistent statements. Eighth, he asserts the court improperly excluded a defense expert from testifying as a sanction for delayed discovery of the witness. Ninth, he challenges the sufficiency of the evidence supporting the firearm use enhancements attached to counts 4 and 5. Tenth, he argues the court erred by failing to instruct the jury on unanimity as to count 12. Finally, he contends that his sentence on count 2 for attempted voluntary manslaughter is unauthorized.

We reach the following conclusions: First, Parra's challenges to the trial court's use of and instruction on the kill zone theory as to count 2 do not support reversal of his convictions for premeditated attempted murder and attempted voluntary manslaughter. Because the jury did not convict Parra under the kill zone theory, any errors in giving or modifying the instruction were harmless beyond a reasonable doubt. However, we agree with Parra that the evidence is insufficient to support his conviction on count 2 for attempted voluntary manslaughter, and that conviction must be reversed. Second, we conclude the court's use of the pre-Assembly Bill 333 pattern jury instruction was prejudicial. This requires reversal of the gang enhancements, the substantive gang offense (count 7), and the related section 12022.53, subdivisions (d) and (e)(1) gang-related firearm use enhancements. Third, we conclude, consistent with a claim by the Attorney General, that Parra's sentence on count 1 is unauthorized. The court imposed a determinate term of seven years for the premeditated attempted murder of Castaneda, but the statutory sentence is an indeterminate term of seven years to life.

3.

Finally, we have considered Parra's remaining claims and find them either meritless, or moot in light of our conclusion that a full resentencing hearing is required on remand. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.) We therefore affirm the judgment in part, reverse in part, and remand the matter to the superior court for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL HISTORY

On July 12, 2021, by a second amended information, the Stanislaus County District Attorney's Office charged Parra with the following crimes: the willful, deliberate, and premeditated attempted murder of Castaneda and Mendoza, respectively (§§ 664, 187, subd. (a); count 1 & 2); discharging a firearm at an occupied motor vehicle (§ 246; count 3); two counts of first degree robbery (§ 212.5, subd. (a); counts 4 & 5); active participation in a criminal street gang (§ 186.22, subd. (a); count 7); two counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1); counts 8 & 10); and three counts of unlawful possession of ammunition (§ 30305, subd. (a)(1); counts 9, 11 & 12). As to counts 1, 2, and 3, it was alleged that a principal personally used and intentionally discharged a firearm, causing great bodily injury or death. (§ 12022.53, subds. (d), (e)(1).) As to counts 4 and 5, it was alleged that Parra personally used a firearm during the commission of the offenses. (§ 12022.53, subd. (b).) And, that counts 1 through 5, and 8 through 11 were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).)

On July 29, 2021, the jury found Parra guilty on counts 1, 3 through 5, and 7 through 12, and found true the firearm and gang enhancements alleged as to those counts. With respect to count 1, the jury further found that Parra acted willfully, deliberately, and with premeditation in the attempted murder. As to count 2, the jury acquitted Parra of attempted murder but convicted him of the lesser included offense of attempted voluntary manslaughter (§§ 664, 192, subd. (a)).

On April 21, 2023, the trial court sentenced Parra.

A timely notice of appeal followed.

4.

***The Olympia Street Drive-by Shooting (Counts 1, 2, 3, 7, 8, 9)***

On February 19, 2018, at approximately 1:53 p.m., Omar Castaneda was driving his pickup on Olympia Street in Modesto when he stopped at a friend's house. His girlfriend, Jovina Mendoza, was in the passenger seat. Castaneda was an active Sureño gang member.

Castaneda parked facing south on the left side of Olympia Street, got out of the truck, and went inside. Mendoza stayed in the truck, where the radio was playing loudly. She was sitting on her knees, facing the driver's side, hunched over the center console, and using her phone as she waited. A few minutes later, Castaneda returned and quickly got back into the driver's seat. Almost immediately, he heard "a lot of bangs." Mendoza had been shot.

Castaneda did not see who fired at his truck or know the reason for the shooting. Mendoza did not see or hear the gunshots but felt a stinging sensation in her thigh as they drove away. Castaneda quickly drove her to the hospital, where she was treated for a gunshot wound to her right buttock.

Castaneda testified he could not distinguish between old and new damage because his truck already had bullet holes from a prior shooting. Mendoza, however, testified that four bullet holes in the passenger door, depicted in People's Exhibit No. 10, were new. She also observed fresh rips in the seat fabric where she had been sitting.

J.M. was sitting in a parked car at his cousin's residence nearby when he heard gunshots and ducked down. He saw a gold brown sedan speed away northbound toward Richie's Market.

T.W. was hanging out in front of his brother's residence on Olympia Street. He saw a silver GMC Silverado heading south on Olympia Street with loud music park across the street. A northbound four door sedan with four occupants then pulled up alongside the truck, stopping in the middle of the street as the vehicles faced opposite directions. T.W. saw the glint of a gun and then a flash from the rear passenger window.

He ducked as four to five gunshots rang out. T.W. observed the sedan speed north while the Silverado drove south.

Sergeant Darwin Hatfield of the Stanislaus County Sheriff's Department recovered three .223-caliber shell casings and a copper jacketing fragment. He opined that the bullets could have been fired from any of several types of rifles, including an AR-15 style rifle. He specifically opined that the casings "came from a .223 caliber-sized handgun." Hatfield also observed "acceleration marks" on the roadway consistent with rapid movement in both the northbound and southbound directions of the 1700 block of Olympia Street.

Deputy Barry Ballance of the Stanislaus County Sheriff's Department contacted Castaneda at the hospital and observed bullet holes in his pickup. Castaneda first stated that he was driving with Mendoza when a small sedan fired at him, but moments later said he had been outside the truck when the shooting occurred. He described the suspect vehicle as a small, brownish four-door car.

Sergeant Tom Letras with the Stanislaus County Sheriff's Department reviewed surveillance footage from Richie's Market, located on Olympia Street and Butte Avenue. A light brown Toyota sedan was depicted turning from westbound Butte Avenue onto southbound Olympia Street at 1:53 p.m., returning two minutes later. A still image showed a driver in a red hoodie with white drawstrings, but the license plate was unreadable.

Sergeant David Thompson with the Stanislaus County Sheriff's Department identified the license plate of the suspect vehicle.

Detective David Corder of the Stanislaus County Sheriff's Department testified that two days before the shooting, he saw the Toyota parked at a residence on

Glenn Avenue, with Parra standing nearby.[5]  Parra was wearing a red zip-up sweatshirt with white drawstrings.

On March 1, 2018, Corder observed the suspect vehicle while on patrol and initiated a traffic stop.  Alberto was driving, Elias Ruis was in the front passenger seat, and Parra was seated in the back.  Parra was wearing a red True Religion hoodie with white drawstrings.  A .223-caliber spent shell casing was recovered from underneath the back seat.

Thompson believed Parra was the driver in the surveillance video still based on his clothing.  However, he acknowledged that Instagram photos depicting Alberto, or possibly his twin brother, appeared to show Alberto wearing a similar sweatshirt to the one Parra was wearing.  The Instagram photograph or post was dated just six days after the shooting.

Hector Lopez, a former affiliate of the Deep South Side Modesto (DSSM) gang, testified under a plea and immunity agreement.  Lopez was a passenger in the Toyota during the shooting.  He explained that earlier that day, he, Parra, Carlos Bautista, and Luis Casarez were hanging out at a residence.  Parra borrowed Alberto's car, and the four left to transport "the pistol AR, the mini AR."

Parra drove down Olympia Street, where Castaneda lived. Castaneda was a known Sureño.  He had previously taunted Parra and his companions by flashing gang signs at them and waving a gun in their direction.[6]

After spotting Castaneda's truck, Parra made a U-turn, saw Castaneda approaching his truck, and asked, " 'Well, who's going to shoot him?' "  Lopez handed the gun to Casarez, who was seated in the rear right seat.  When Casarez hesitated, Parra told him

---

**5**  We refer to Alberto Bautista by his first name throughout the remainder of this opinion since he shares the same last name as Parra's codefendant, Carlos Bautista.  No disrespect is intended.

**6**  Lopez testified that one of the taunting incidents may have occurred just prior to the shooting, but admitted some confusion as to the temporal proximity of events, stating that the taunting occurred on multiple occasions.

that he was going to do it and that " 'he was a b[****] if he didn't ….' " Parra then slowed or stopped next to the truck, and Casarez fired up to five shots.

Lopez stated that following the shooting, they threw some of the expended shell casings into a canal on Dallas Street.

### The Avon Street Home Invasion (Counts 4, 5, 7, 10, 11)

On April 11, 2018, A.M. was visiting his friend, M.M., at her residence on Avon Street. Just before midnight, they were about to eat when they heard persistent knocks at the front door. M.M. asked who was there several times but no one answered. Moments later, they heard a window break and the front door being forced open. A.M. and M.M. ran to separate bedrooms.

In her bedroom, M.M. tried to call 911 but was too flustered to unlock her phone, so she threw it under the bed. An intruder, later identified as codefendant Carlos Bautista, entered the bedroom, pointed a small handgun at her, told her not to look at him, and struck her on the head with the gun three times. She described him as chubby, with long, curly hair, wearing a black shirt and dark jeans.

Meanwhile, A.M. was in another bedroom when an intruder entered, hit him, and took his phone. He could not see the assailant.

Bautista dragged M.M. into her brother's room by her hair, threw her on the floor next to A.M., and held them both at gunpoint. M.M. thought she was going to die.

Bautista pressed the gun to the back of A.M.'s head, threatened to kill him, and demanded money and car keys. When A.M. looked up, he was struck in the head with the gun and punched in the stomach. Bautista took rings from A.M.'s fingers and threatened to cut them off if they did not hand over money.

M.M. heard other intruders ransacking the residence. Another man entered the room and warned that someone was outside. Before fleeing, the intruders took M.M.'s car keys and told her not to call the police.

A.M. lost rings and his phone; M.M. lost her keys, purse, phone, and passport. Both later viewed photo lineups and identified Bautista as the "chubby" intruder. M.M.

8.

was 80 percent certain, noting his long hair obscured part of his face, while A.M. was certain of his identification.

Officers found a loaded handgun magazine on the front porch of the residence, and a 9mm handgun, without a magazine, on the other side of the back fence along Sonora Avenue. A shoeprint was located near the gun. Latent palm and fingerprints recovered from a baby monitor camera that was inside the residence matched Bautista's prints through a database search, which was later confirmed by examiners.

On March 24, 2018, prior to the Avon Street robbery, Detective Brock Dias with the Stanislaus County Sheriff's Department followed Parra, who was driving a white Infiniti, to Bautista's apartment complex. Bautista was one of the passengers in Parra's vehicle. Dias surreptitiously installed a GPS tracking device on the vehicle.

Data from the GPS tracker showed the Infiniti leaving 1381 Inyo at 11:00 p.m. on April 11, 2018. It arrived on Avon Street at 11:20 p.m., was on Sonora Avenue at 11:26 p.m., returned to Avon Street between 11:37 p.m. and 11:43 p.m., and then went back to 1381 Inyo at 12:39 a.m. These time frames coincide with the home invasion on Avon Street.

At 12:54 a.m., the vehicle arrived at Bautista's residence. At 1:37 a.m., it was at a Denny's restaurant, where surveillance video showed Parra, Bautista, and Lopez arriving together and leaving at 2:30 a.m., before returning to Bautista's residence at 2:35 a.m.

Lopez admitted he was one of the three perpetrators who entered the Avon residence. He testified that earlier that day, he and Bautista were together when Parra arrived and suggested robbing a residence where pounds of methamphetamine were supposedly stored in a safe. Bautista agreed, but they needed another person, so they recruited nongang member Kai Fierra.

Parra drove the group in the white Infiniti. Bautista may have been armed with a nine-millimeter handgun.

Parra drove to an acquaintance's residence on Inyo Street and retrieved a mini-AR from the trunk of a parked car. After stopping at a smoke shop on Crow's Landing, he

drove the group to the Avon Street residence, where he remained in the car while the others went inside. Bautista carried the nine-millimeter handgun and Kai had the mini-AR. Bautista broke a window with his gun, dropping the magazine in the process, and Lopez then kicked down the front door.

Inside, Bautista yelled at the victims and forced them into a bedroom, while Lopez and Kai searched for the safe, which they eventually found in a back room. Lopez saw Bautista strike a victim and take his ring, and Kai removed valuables from a closet. When Lopez thought someone was arriving, he told the others it was time to leave. They fled out the back, jumped the fence, and ran to Parra's vehicle. Bautista, who struggled to get over the fence, dropped his gun in the process.

Lopez testified that the safe was empty. The group left it, along with the other stolen property, with Kai. Kai stayed behind while the others went first to the smoke shop and then to Denny's. After the home invasion, Parra sold his vehicle to a friend.

### Unlawful Possession of Ammunition (Count 12)

On January 3, 2019, during the course of an investigation, the Stanislaus County Sheriff's Department Air Support Unit observed Yobani Yepez and Oleg Arreola passing guns and ammunition over the fence between 1309 and 1313 Inyo Avenue to a transient. They wrapped the items in a blue tarp and attempted to bury them.

During a subsequent search, deputies recovered an AR-15 style rifle, multiple handguns (including a Glock), magazines, several boxes of .223-caliber ammunition, and both live and spent .223-caliber casings. The prosecutor told jurors that count 12 was based on all the ammunition recovered from 1309 and 1313 Inyo Avenue on January 3, 2019.

Sheriff's deputies observed several vehicles parked in the driveway of 1309 Inyo Avenue, including a green Range Rover SUV and a black Infiniti sedan. Documents with Parra's name were found in the Range Rover. A hidden compartment in the center console of the black Infiniti contained cash, a cell phone, two handgun magazines, and a

baggie of live ammunition.  Lopez testified that Parra drove a gray Infiniti with a stash spot in the center console.

A bedroom in the residence at 1309 Inyo Avenue contained clothing and paperwork with Parra's name on it.  Days later, Parra was seen wearing one such item, specifically, a hoodie with the word "Cookies" on it.  Photographs posted to Parra's Instagram account showed Parra in what appeared to be the same bedroom, holding handguns and wearing clothing later found there.

After the search, deputies surveilled the residence on 1309 Inyo Avenue, believing that Parra would return there because he likely lived there.  When he did, he was arrested.

***The Gang Evidence***

The prosecutor theorized that Parra and codefendant Bautista were members of the DSSM Norteño criminal street gang and that the shooting and the robbery were committed for the benefit of the gang.  Witnesses who testified for the prosecutor explained that DSSM is a subset of the larger Norteño criminal street gang, which operates under the Nuestra Familia (NF) prison gang.

Based on a hypothetical mirroring the February 19, 2018 shooting, Stanislaus County Sheriff Detective Brock Dias, the prosecutor's gang expert, opined that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote or further gang conduct.  He explained that the crime would instill fear in rival Sureños and enhance the perpetrators' reputations.  In addition to the hypothetical, Dias also offered opinions based on the facts of the case, testifying that the crime elevated DSSM members and, because it was carried out by three DSSM gang members, was committed "in association with other gang members."  He added that such an offense would help the Norteño gang protect its territory, which was important for revenue-producing crimes such as drug sales, and for recruiting new members.

With respect to the home invasion, Dias testified that such a crime would benefit the entire gang because proceeds from the robbery would be taxed and sent to jail to

11.

support members of the NF. He further explained that the offense would enhance the perpetrators' reputations by demonstrating a willingness to put in work for the gang. Dias explained that such a crime would also be committed in association with the gang, given the perpetrators' claimed membership in the gang.

The prosecutor presented detailed evidence demonstrating that Parra was an active DSSM gang member at the time of the crimes. Dias testified that Parra used the gang monikers "P" and "Money" and had several DSSM-related tattoos, including a script "D" on his ring finger (symbolizing "marriage" to the gang), a Monopoly man on his hand (representing the pursuit of money), and the one dot/four dot symbol on his face. He was known to flash DSSM hand signs and to tag (graffiti) DSSM territory with his moniker.

Between 2016 and 2018, law enforcement contacted Parra multiple times. On those occasions, he admitted active DSSM membership, was observed with gang tattoos and clothing, was in the company of other Norteño gang members, or was otherwise documented as an active DSSM gang member.

Lopez testified that Parra, Bautista, and Casarez were all active DSSM gang members. When he was active in the gang, Lopez observed Parra and Bautista throwing gang signs, and that Parra would often tag DSSM gang indicia.

As to Parra specifically, Lopez stated that he recruited younger individuals into the gang and directed them to commit crimes. Lopez explained that younger members were expected to "put in some type of work" for the gang by committing home invasions and shootings. In the context of drive-by shootings, younger members were expected to take possession of the gun because, if caught, they would only be sent to juvenile hall.

## DISCUSSION

### I. Codefendant Bautista's *Batson/Wheeler* Motion

Parra contends the trial court erred in denying his codefendant's *Batson/Wheeler* motion, arguing that the totality of the circumstances supported an inference the prosecutor exercised peremptory challenges against two jurors in same-sex relationships with a discriminatory purpose. The Attorney General responds that the claim is forfeited

12.

and, in any event, lacks merit.  Parra further argues that, if the claim was not preserved, trial counsel was ineffective for failing to join in Bautista's *Batson/Wheeler* motion.  We conclude the *Batson/Wheeler* motion was properly denied.

### A.  *Forfeiture/Ineffective Assistance of Counsel*

The Attorney General argues that because Parra failed to join in Bautista's *Batson/Wheeler* motion, Parra has forfeited his claim.

Parra acknowledges that he did not object or otherwise join in codefendant Bautista's *Batson/Wheeler* motion, a circumstance that generally results in forfeiture. (See generally *People v. Mitcham* (1992) 1 Cal.4th 1027, 1048 [failure to timely join a codefendant's motion forfeits appellate review]; see also *People v. Bolin* (1998) 18 Cal.4th 297, 316 [failure to make a *Wheeler* motion forfeits appellate review of a claim that certain groups of prospective jurors were improperly excluded from the petit jury].)

However, Parra argues that his claim was not forfeited because (1) waiver and forfeiture principles do not apply to *Batson/Wheeler* motions; (2) his counsel and Bautista's counsel acted jointly during voir dire; and (3) any objection would have been futile in light of the trial court's denial of Bautista's motion.

Contrary to Parra's assertion, *Batson/Wheeler* claims must be timely raised or they are forfeited.  (See *People v. Cunningham* (2015) 61 Cal.4th 609, 662 ["In order to preserve a *Batson/Wheeler* claim based on the prosecutor's peremptory challenges, the defendant must make a timely objection"].)  We also reject Parra's contention that his claim was preserved through his codefendant's objection.  As courts have explained, "a defendant cannot take advantage of objections made by a codefendant in the absence of a stipulation or understanding to that effect." (*People v. Cooper* (1970) 7 Cal.App.3d 200, 205.)  Parra identifies no portion of the record suggesting that such a stipulation was made or such an understanding occurred here.

Nevertheless, we accept Parra's assertion that any objection would have been futile, thereby excusing the lack of a timely objection.  (See *People v. Wilson* (2008) 44 Cal.4th 758, 793 ["A litigant need not object, however, if doing so would be futile"].)

13.

Our conclusion is based not on the trial court's finding that Bautista failed to make a prima facie showing, but on the fact that any objection by counsel would have been substantively meritless. (*People v. Price* (1991) 1 Cal.4th 324, 387 [counsel's failure to make a futile or unmeritorious objection is not deficient performance].) As explained below, our conclusion forecloses Parra's claim of ineffective assistance of counsel.

### B. *Background*

On May 27, 2021, jury selection commenced. Because of the pandemic, voir dire was conducted in five groups of approximately 19 to 20 prospective jurors over several days, rather than with a single larger panel of 100. During the initial stage of voir dire, prospective jurors were asked about their occupation, marital or relationship status, the occupation of their spouse or significant other, their city of residence, whether they had children and if those children were adults, their children's occupations, and any prior jury service.

No questions were asked regarding sexual orientation, and prospective jurors were not asked to identify their gender or the gender of their spouse or significant other. Consequently, the record does not reveal the sexual orientation of most prospective jurors. For example, some prospective jurors either did not indicate whether they had a significant other or stated that they did not have one, while others referred to a spouse or partner in gender-neutral terms.

Prospective Juror G.C., questioned as part of the fourth panel, stated that she was a retired preschool teacher living in Modesto with her spouse, whom she identified using female pronouns. She also stated that she had three adult children and had never previously served on a jury. When asked during defense voir dire whether she could reach a verdict based on the evidence even if the defendant did not testify, she responded, "I think I could just look at the evidence and make a decision without hearing him testify."

Prospective Juror C.M., part of the fifth panel, identified herself as a nanny, stated that she had a girlfriend, and confirmed she had never served on a jury. During voir dire,

she indicated she would deliberate based on the evidence but remain open to opposing views.  When asked about her experience living in Modesto, she explained that she had lived there briefly and had not left due to concerns about violence.

In response to the prosecutor's questioning, C.M. disagreed with another juror's statement that gang members do not attend baseball games, commenting:  "I feel they could possibly go to a baseball game.  I think it's ignorant to say they wouldn't.  I feel they could be part of normal society."  When asked whether gang members who committed a robbery at a baseball game because the victim was wearing the wrong color would be engaging in gang activity, C.M. answered affirmatively.

The prosecutor exercised a peremptory challenge to excuse C.M. shortly after she was seated in the jury box.  After C.M.'s excusal, the trial court continued to refill the jury box as challenges were exercised.  Initially, 20 prospective jurors were seated, but after repeated strikes only four remained.  Another 16 jurors were then called, followed by 11 more when the panel again dwindled.  Prospective Juror G.C. was among the latter group.  As the defense exercised additional challenges, the prosecutor passed four times, used a peremptory challenge, and then passed again.

Eight new jurors were called into the box.  The parties alternated challenges, and with her fourth peremptory in that sequence, the prosecutor excused G.C.  After G.C. was struck, counsel for codefendant Bautista asked to approach to make a *Batson/Wheeler* motion, which the court deferred.

During a break in the proceedings and outside the presence of the jury, Bautista's trial counsel made a *Batson/Wheeler* motion based on the prosecutor's strikes of C.M. and G.C., arguing that both appeared to be members of a protected class based on their references to female partners.  The prosecutor responded, "I don't know what [G.C.'s] sexual orientation is."  The trial court denied the motion, finding no prima facie showing of discrimination.

Trial counsel explained that G.C. had mentioned her girlfriend's profession, and both G.C. and C.M. stated that they lived with their girlfriends.  Trial counsel stated,

15.

"Those are, as far as I know, the only two people with a different sexual orientation, and both of them have been stricken." The court again denied counsel's motion, finding no prima facie showing.

Voir dire then continued, and a jury was ultimately sworn.

### C. *Applicable Law:  Batson/Wheeler*

Our federal and state constitutions prohibit a prosecutor from striking a prospective juror based on personal characteristics that are unrelated to the ability to serve impartially, such as race, sex, ethnicity, or as relevant here, sexual orientation. (*Batson v. Kentucky*, *supra*, 476 U.S. at p. 89; *Taylor v. Louisiana* (1975) 419 U.S. 522, 538 [the systematic exclusion of women from juries violates the Sixth and Fourteenth Amendments to the federal constitution; *People v. Douglas* (2018) 22 Cal.App.5th 1162, 1169 ["excluding prospective jurors solely on the basis of sexual orientation runs afoul of the principles espoused in *Batson* and *Wheeler*"].) The "[e]xclusion of even one prospective juror for reasons impermissible under *Batson* and *Wheeler* constitutes structural error, requiring reversal." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158.)

It is presumed that the prosecutor exercises peremptory challenges in a constitutional manner. (*People v. Johnson* (2015) 61 Cal.4th 734, 755.) In evaluating a *Batson/Wheeler* motion, the trial court applies the three-step framework set forth in *Batson*. (*People v. Taylor* (2009) 47 Cal.4th 850, 885–886.) "The ultimate burden of persuasion [as to discriminatory purpose] rests with, and never shifts from, the opponent of the strike." (*Id*. at p. 886.)

Applying this three-step analysis to the instant case, Parra was required to establish the following:  First, he had to make a prima facie showing by producing facts sufficient to support an inference that the prosecutor acted with discriminatory intent in striking the prospective jurors. Second, if that showing was made, the burden would shift to the prosecutor to provide a nondiscriminatory reason for the strike. Third, if such a reason was offered, the court was required to evaluate the prosecutor's stated rationale

and determine whether Parra demonstrated "it ' "[is] more likely than not that the challenge was improperly motivated." ' "[7] (*People v. Baker* (2021) 10 Cal.5th 1044, 1071.)

We review the trial court's denial of a *Batson/Wheeler* motion at the first step for substantial evidence. (*People v. Battle* (2021) 11 Cal.5th 749, 772 (*Battle*).) "In conducting our review, we remain mindful of the 'low threshold' showing required for *Batson*'s first step. [Citation.] This step should not 'be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination.' [Citation.] It is satisfied simply by evidence sufficient to permit us to draw an inference that discrimination *may* have occurred." (*Id*. at p. 773.)

"In establishing a prima facie showing, a defendant has the burden of demonstrating that the facts and circumstances of the case raise an inference that the prosecutor excluded prospective jurors based on [a protected characteristic]." (*People v. Streeter* (2012) 54 Cal.4th 205, 223, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834; see *People v. Rhoades* (2019) 8 Cal.5th 393, 430, fn. 15 (*Rhoades*) ["it was defendant's burden to make the record necessary to support his motion"]; *People v. Jones* (2013) 57 Cal.4th 899, 916 [the moving party has the burden to " ' "make as complete a record as feasible" ' " to support a prima facie showing].)

In determining whether this initial burden has been met, courts consider the totality of the relevant circumstances. (*Battle*, *supra*, 11 Cal.5th at p. 773.) "Certain

---

[7]     In 2020, the Legislature passed Assembly Bill No. 3070 (2019–2020 Reg. Sess.) (Assembly Bill 3070) which enacted Code of Civil Procedure section 231.7 (Stats. 2020, ch. 318, §§ 1, 3). Among other changes, the statute requires the trial court to sustain a party's objection to the dismissal of a prospective juror if "there is a substantial likelihood that an objectively reasonable person would view … sexual orientation … as a factor in the use of the peremptory challenge …." (*Id*., subd. (d)(1).) Because Assembly Bill 3070 only applies to jury trials occurring on or after January 1, 2022, and Parra's trial occurred in 2021, it does not apply to his case.

17.

types of evidence are especially relevant to this inquiry, including whether the prosecutor has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group in which the majority of the remaining jurors belong." (*Ibid*.) However, the prosecutor's statement of reasons for excusing a prospective juror is irrelevant at the first step and cannot be relied upon in determining whether a prima facie case of discrimination has been made. (*People v. Scott* (2015) 61 Cal.4th 363, 390.)

### D. *Analysis*

Our Supreme Court has acknowledged that " '[a]lthough circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case … to make a prima facie case after the excusal of only one or two members of a group is very difficult.' " (*Battle*, *supra*, 11 Cal.5th at p. 776.) The instant case provides a textbook example of this principle.

We conclude that the existing record does not support a reasonable inference that the prosecutor excused prospective jurors based on sexual orientation. Although C.M. and G.C. were the only two prospective jurors who made statements suggesting they may have been in same-sex relationships, there is no evidence establishing that they were the only nonheterosexual individuals in the venire.[8] Absent a more complete record, any such inference would rest on speculation rather than evidence.

The record reflects that G.C. remained in the jury box through multiple rounds in which the prosecutor declined to exercise a peremptory challenge. Indeed, after excusing C.M., the prosecutor passed on the panel four times, then exercised a peremptory against

---

[8]    We accept, for purposes of analysis, that C.M. and G.C. are women, though they did not identify themselves as women on the record. We further accept, consistent with Parra's framing of the issue, that their participation in same-sex relationships is relevant to an inference regarding their sexual orientation.

18.

a different juror before passing again. Eight new jurors were then called into the box. As the parties continued alternating challenges, the prosecutor used three additional strikes before exercising her fourth to excuse G.C. In total, the prosecutor passed on the panel five times while G.C. was seated, such that had the defense also passed, G.C. would have been sworn as a juror.

" '[T]he prosecutor's passes' do not 'themselves wholly preclude a finding that a panelist is struck on account of bias ….' [Citation.] A delay in striking these jurors could also align with a strategy to avoid detection of [sexual-orientation-based] strikes." (*Battle*, *supra*, 11 Cal.5th at p. 777.) However, Parra fails to offer any evidence demonstrating that "such a strategy existed here." (*Ibid*.) Here, the record suggests that the prosecutor's decision to excuse G.C. and C.M. was not based on their sexual orientation, but rather reflected a considered assessment of the evolving dynamics among the prospective jurors, including their personalities and voir dire responses, as the panel's composition changed in response to the parties' use of peremptory challenges.

Parra observes however that the prosecutor did not ask G.C. " 'any questions at all' " during voir dire and asked C.M. only a single question about whether gang members would attend baseball games, and their responses did not raise any "red flags." We are not persuaded that the prosecutor's limited questioning necessarily indicates a discriminatory motive in exercising peremptory challenges against these prospective jurors. A peremptory challenge may be based on nothing more than a hunch or suspicion. (See *People v. Turner* (1994) 8 Cal.4th 137, 165, abrogated on other grounds by *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn 5.) Thus, while limited or desultory questioning may be a relevant consideration in assessing a prima facie case, that alone is insufficient to establish purposeful discrimination in the absence of other supporting evidence.

Parra further observes that all parties in this case were Hispanic and, based on that fact, speculates that the prosecutor excused G.C. and C.M. because "gays and lesbians would be less inclined to convict a Hispanic defendant." Parra explains that since both groups have historically been subject to discrimination, "there is a greater tendency for

19.

the prosecution to exclude members of [such groups]." This assertion is unsupported by any evidence in the record and rests on a tenuous and unsubstantiated assumption about both the prospective jurors' sexual orientation, and their views toward defendants of a certain ethnic background. While only an inference of discriminatory intent is required at the first step of *Batson/Wheeler*, that inference must be grounded in the totality of relevant circumstances, not conjecture.

Parra invites further speculation as to whether the trial court considered sexual orientation as a cognizable group entitled to the same protections as race or ethnicity, based solely on the court's unexplained finding that no prima facie case had been established. But the court's absence of an express discussion about sexual orientation does not establish legal error. Trial courts are not required to make detailed findings at the first step of the *Batson/Wheeler* inquiry, so long as the record supports the conclusion that no inference of discriminatory intent was raised. (See *People v. Scott*, *supra*, 61 Cal.4th at p. 384.) Here, Parra offers no affirmative evidence suggesting the court failed to apply the proper legal framework, and his argument rests entirely on speculation about what the court may have considered, or failed to consider, in reaching its conclusion.

Based on the foregoing, we conclude that Parra's *Batson/Wheeler* claim was properly denied at the first stage. The record does not contain sufficient evidence to support an inference that the prosecutor acted with discriminatory intent in exercising peremptory challenges against G.C. and C.M. based on their sexual orientation.

## II.     Instructional Error and Assembly Bill 333

Parra was tried in 2021, and the jury was instructed using the CALCRIM instructions in effect at that time, including CALCRIM Nos. 1400 (active participation in criminal street gang), 1401 (felony or misdemeanor committed for benefit of criminal street gang), and 1402 (gang-related firearm enhancement). Effective January 1, 2022, Assembly Bill 333 amended section 186.22, adding new substantive elements and procedural requirements for proving gang enhancements and the substantive offense of active gang participation. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477.) Those

changes apply retroactively to all convictions that had not yet reached finality at the time Assembly Bill 333 was enacted. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207 (*Tran*); *People v. Lopez* (2025) 17 Cal.5th 388, 394.)

Parra contends that because the jury was instructed under the pre-Assembly Bill 333 version of the law, all gang-related enhancements (§ 186.22, subd. (b)), including the gang-related firearm enhancements (§ 12022.53, subds. (d) & (e)), must be stricken, and his conviction on count 7 for the substantive gang offense (§ 186.22, subd. (a)) must be reversed. The Attorney General agrees that Assembly Bill 333 applies retroactively to Parra's case but argues it is unnecessary to strike the gang enhancements or reverse the gang conviction because any instructional error was harmless beyond a reasonable doubt.

We conclude the instructional error here, which arose as a byproduct of intervening legislation, was not harmless beyond a reasonable doubt. Accordingly, we reverse the gang enhancements, the gang-related firearm enhancements, and the substantive gang offense, all of which may be retried at the prosecutor's election. (See *People v. Hallock* (1989) 208 Cal.App.3d 595, 610.)

### A. *Background:  Evidence Establishing the Existence of the Gang*

To prove the existence of DSSM as a criminal street gang, the prosecutor relied on the testimony of Dias, who had investigated crimes committed by DSSM members, including Parra, Bautista, and Lopez, and who had received extensive training on local gangs, including the Norteños. The prosecutor also relied upon the testimony of Lopez, who was familiar with the innerworkings of the DSSM gang, the defendants, and many of the subjects of the predicate offenses.

Dias testified that DSSM is one of at least 20 subsets of the Norteños, who are controlled by the NF prison gang. Drawing on his investigative experience, Dias opined that DSSM had approximately 100 members as of 2018. He further explained that DSSM members use common signs and symbols, including the letter "D" for DSSM, the

21.

numbers "4" and "14" referencing "N," the 14th letter of the alphabet, and the Detroit Tigers baseball logo.

Dias opined that the primary activities of DSSM Norteño include weapons violations, including the possession of weapons by prohibited persons, vehicle theft, robberies, burglaries, and selling narcotics. According to Dias, individuals may become members of the NF by committing crimes for the gang, paying dues to the organization, and otherwise engaging in conduct that generates revenue for the gang. Such crimes range from narcotics sales and burglaries to more serious offenses, including home invasion robberies.

To prove a pattern of criminal gang activity under section 186.22, the prosecutor introduced certified court records of predicate offenses committed by DSSM members. These included:

- In 2015, Carlos Bautista committed two separate vehicle thefts (§ 10851).
- On October 15, 2016, Parra committed felony evasion from a peace officer (Veh. Code, § 2800.2, subd. (a)) and unlawful possession of a firearm (§ 29820).
- On October 8, 2016, Jorge Gonzales, Jr., a DSSM member, possessed a controlled substance while armed with a firearm (§ 11370.1, subd. (a)) and carried a loaded firearm in public as an active gang member (§ 25850, subd. (c)(3)).
- On July 9, 2017, Jorge Gonzales, Jr., unlawfully possessed a weapon and ammunition (§§ 29800, subd. (a)(1), 30305, subd. (a)(1)).
- On September 14, 2017, Parra committed felony evasion (Veh. Code, § 2800.2, subd. (a)).
- On February 28, 2018, Anthony Daniel Gonzalez distributed an assault weapon (§ 30600, subd. (a)), possessed an assault weapon (§ 30605, subd. (a)) and admitted a gang enhancement (§ 186.22, subd. (b)(1)(A)). Dias, who personally investigated the case, opined that Gonzales was an active Norteño gang member.
- In 2018, Yobani Valencia Yepez and Alberto Bautista committed a home invasion robbery (§ 211) with gang and firearm use enhancements (§§ 186.22,

22.

subd. (b)(1)(A), 12022.53, subd. (b)), and false imprisonment (§ 236) with a gang enhancement (§ 186.22, subd. (b)(1)(A)).  Lopez testified that he knew both Yepez and Alberto and identified them as DSSM gang members.

- On June 20, 2018, Luis Angel Casarez and George Arthur Muñoz II committed first degree burglary (§ 459) and multiple counts of assault with a firearm (§ 245, subd. (a)(2)), each with gang enhancements (§ 186.22, subd. (b)(1)(C)).  Dias testified that Casarez is a documented DSSM gang member.  Lopez, who testified that he knew both Casarez and Muñoz personally and had participated in crimes with them, identified Casarez as an active DSSM gang member.  He stated that Muñoz was not a DSSM member but was affiliated with the "north side."

Lopez testified that he joined DSSM at age 14 or 15 after growing up around the gang in south Modesto.  He corroborated Dias's testimony that DSSM is a Norteño subset with over 100 members.

According to Lopez, DSSM's primary criminal activities include burglaries, home invasions, robberies, and shooting rival gang members, the commission of which were regarded as "putting in work" for the gang.  He described DSSM's hierarchical structure, in which lower-ranking "street soldiers" could advance by putting in work for the gang or time spent in custody.

Lopez detailed the gang's signs and symbols, including tattoos (such as the Old English "D," the number 14, and one dot/four dot patterns), colors (red), and clothing brands (True Religion), all of which must be earned.  He testified that DSSM claimed territory in the South Modesto/Crows Landing area.

According to Lopez, Norteño gang members were expected to pay a 10 percent "tax" to the gang, with the proceeds used to support incarcerated members.  With respect to members of the Stanislaus County area Norteño subsets, however, the obligation to pay taxes varied.  Lopez explained that DSSM was one of several Stanislaus County Norteño subsets, which also included the Deep South Side Locs, the Deep South Side Norteños, the Deep South Side Youngsters, and the Deep Nite Owl Locs.  Lopez further testified

that Parra told him he owed tax money to the gang, and that Bautista had money placed on his books by a DSSM Norteño.

Lopez testified that firearms were treated as shared gang property and were safeguarded by members who were not on probation to avoid law enforcement detection. He further stated that all DSSM members had access to and could use these guns.

Finally, Lopez explained that DSSM coordinated through social media, believing that their communications could be deleted. The gang also maintained internal rules, including prohibitions on drive-by shootings, which were regularly enforced.

### B. *Assembly Bill 333*

" 'Assembly Bill 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, *organized* association or group of three or more persons." (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members "individually *or* collectively engage in" a pattern of criminal activity in order to constitute a "criminal street gang," Assembly Bill 333 requires that any such pattern have been "*collectively* engage[d] in" by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a "pattern of criminal activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any "common benefit" be "more than reputational." (§ 186.22, subd. (g).)' " (*Lopez*, *supra*, 17 Cal.5th at pp. 395–396; see also *Tran*, *supra*, 13 Cal.5th at p. 1206.)

24.

"Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual rival gang, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)

### C. *Harmless Error Standard for Omitted Elements in Jury Instructions*

The parties agree that the jury was instructed under the pre-Assembly Bill 333 version of section 186.22 and that, as a result, the instructions omitted elements now required under the amended statute.  The relevant question here is whether those omissions were harmless beyond a reasonable doubt.

When jury instructions omit elements that apply retroactively, a defendant is entitled to remand for further proceedings unless the error is harmless.  (See *People v. Clark* (2024) 15 Cal.5th 743, 763.)  The parties agree that prejudice resulting from such an instructional omission is reviewed under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  (See *Neder v. United States* (1999) 527 U.S. 1, 4; *Tran*, *supra*, 13 Cal.5th at p. 1207 [when a substantive change alters the elements of an offense and the jury is not instructed accordingly, the omission implicates the Sixth Amendment right to a jury trial, and reversal is required unless it appears beyond a reasonable doubt the verdict would have been the same absent the error].)

"In this assessment, we 'conduct a thorough examination of the record.  If, at the end of that examination, [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—[we] should not find the error harmless.' [Citation.]  Conversely, where we conclude 'beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' "
(*People v. Lamb* (2024) 16 Cal.5th 400, 449.)

25.

" 'In assessing prejudice in this context, the question is not whether there is evidence in the record that would support a jury finding of the missing element. Instead, we ask whether we can conclude beyond a reasonable doubt that "the jury verdict would have been the same" had the jury been instructed on the missing element.' [Citation.] 'Our task, then, is to determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' " (*People v. Lamb*, *supra*, 16 Cal.5th at p. 449; *People v. Schuller* (2023) 15 Cal.5th 237, 261 [the instructional error is harmless only if the reviewing court can conclude beyond a reasonable doubt that no reasonable jury would have found in the defendant's favor on the omitted element, given the verdict and the state of the evidence].)

### D. *Analysis*

A "criminal street gang" under newly amended section 186.22, subdivision (f), is defined as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." Given this definition, the question is whether we can conclude beyond a reasonable doubt that the evidence presented at trial was such that no reasonable jury would have failed to find each of these elements satisfied.

#### 1. *Whether DSSM Was an Ongoing, Organized Association or Group of Three or More Persons with a Common Name, Sign, or Symbol*

As amended by Assembly Bill 333, section 186.22 now requires proof that a criminal street gang is "an ongoing, organized association or group of three or more persons, … having a common name or common identifying sign or symbol[.]" (§ 186.22, subd. (f).) Previously, the statute required only proof of an "ongoing organization, association, or group of three or more persons," without expressly requiring that the group be organized. (former § 186.22, subd. (f).)

Considering the jury's findings and the state of the evidence, we are satisfied beyond a reasonable doubt that no reasonable jury would have found in Parra's favor on the issue of whether DSSM was an ongoing, organized association of three or more persons with a common name, sign, or symbol. Parra does not contend otherwise.

The prosecutor presented testimony from both law enforcement and Lopez, a former DSSM gang member. Dias, testifying as a gang expert, stated that DSSM was one of at least 20 Norteño subsets, themselves controlled by the NF. Based on his training and experience investigating gang crimes, Dias opined that DSSM had approximately 100 members. He further explained that DSSM members used shared signs and symbols, including the letter "D," the numbers "4" and "14," and tattoos and clothing styles reflecting their gang affiliation. In his opinion, the gang's primary activities included weapons violations, vehicle thefts, robberies, burglaries, and narcotics sales.

Lopez, in turn, confirmed that DSSM is a subset of the Norteño gang and that it has more than 100 members who often worked in smaller groups. He described DSSM as hierarchical, with lower-ranking "street soldiers" advancing through criminal activity or time in custody. Although he did not opine on whether Parra held a particular rank, Lopez testified that Parra recruited younger individuals and directed them to commit crimes.

Lopez also testified that DSSM maintained a distinct identity through its symbols, tattoos, colors, and clothing. He explained that DSSM claimed territory in south Modesto, enforced internal rules (including prohibitions on drive-by shootings), expected its members to "put in work" for the gang, and required them to pay taxes. Members also shared firearms and communicated through social media.

Taken together, this evidence demonstrated far more than a loose affiliation of individuals. The combined testimony of Dias and Lopez established that DSSM had a defined membership, identifiable symbols, a hierarchical structure, organized methods of communication, and a continuing existence within the larger Norteño network.

27.

Accordingly, although the jury instructions did not reflect the amended statutory definition, we conclude that the omission was harmless beyond a reasonable doubt because the evidence overwhelmingly established that DSSM satisfied this element.

### 2. *Whether DSSM Has Engaged in a Pattern of Criminal Activity*

Assembly Bill 333 also narrowed the definition of a "pattern of criminal gang activity" by requiring that: (1) the last offense relied upon occurred within three years of the commission of the currently charged offense; (2) the offenses were committed by two or more gang "members," rather than merely "persons"; (3) the offenses commonly benefitted a criminal street gang; (4) the offenses establishing the pattern must be different from the currently charged offense; and (5) the prosecution must prove that the predicate offenses "commonly benefitted a criminal street gang" in a manner that is more than reputational. (§ 186.22, subd. (e)(1), (2); *People v. Cooper* (2023) 14 Cal.5th 735, 743 (*Cooper*); *People v. Hin* (2024) 17 Cal.5th 401, 462–463 (*Hin*).)

Several of the alleged predicates here fail at the threshold because they are no longer enumerated offenses under section 186.22, subdivision (e), as amended by Assembly Bill 333. These include Bautista's 2015 auto thefts, and Parra's 2016 and 2017 felony evasions. Even if those crimes had once qualified, they cannot serve as predicates under the current statute. These crimes are no longer considered qualifying predicate crimes under amended section 186.22.

Moreover, Casarez and Muñoz's robbery occurred on June 20, 2018, after both the Olympia Street drive-by shooting (February 19, 2018) and the Avon Street home invasion (April 11, 2018).[9] As Parra correctly observes, "[c]rimes occurring *after* the charged offense cannot serve as predicate offenses to prove a pattern of criminal gang activity." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1458.)

---

[9] Lopez testified that he participated in the offense and that it occurred on June 19, 2018.

We further note that although the record shows Yepez and Alberto were convicted in 2018 of the home invasion, it does not disclose the date the offense was committed. (See § 186.22, subd. (e)(1).) This omission creates ambiguity as to whether the predicate offense may have occurred after the currently charged crimes. Because the People bear the burden of proving each element of the gang enhancement beyond a reasonable doubt, including the gang's existence, we decline to presume that this predicate offense preceded Parra's charged crimes.

The following predicate offenses remain: Parra's 2016 firearm possession (§ 29800), Jorge Gonzales, Jr.'s, 2016 drug-and-firearm-related convictions, Jorge Gonzales, Jr.'s, 2017 firearm and ammunition offense, and Anthony Gonzales's 2018 distribution of an assault weapon.[10] The difficulty for the prosecution, however, is that the record contains insufficient evidence demonstrating how almost all of these crimes benefitted DSSM as an organization rather than merely the individual perpetrators.

"[T]he question of whether an offense is within the gang's primary activities is distinct from the question of whether a particular offense has 'commonly benefited a criminal street gang.' (§ 186.22, subd. (e)(1).) A jury determination regarding the gang's primary activities merely constitutes a conclusion about the types of activities in which a gang typically engages, whereas the question about a common benefit asks about how the specific predicate offense actually benefited the gang. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 473, 478–480 [finding that though the predicate offenses included crimes that could, in theory, provide a monetary benefit to the gang, the evidence did not

---

[10] Parra argues that Anthony Gonzales's February 28, 2018 assault weapon conviction cannot serve as a predicate, both because of its timing and because the evidence was insufficient to establish his gang membership. We disagree. Contrary to his claim, the record demonstrates that Gonzales was an active Norteño gang member, and that the larger Norteño gang was in fact organizationally connected to DSSM. (See *People v. Prunty* (2015) 62 Cal.4th 59, 76.) In light of our conclusion that the record does not contain evidence of two qualifying predicates, we do not recite the evidence supporting our conclusion.

show that these predicate offenses *actually* benefited the gang].)" (*Cooper*, *supra*, 14 Cal.5th at pp. 743–744.)

*Cooper* is illustrative. In *Cooper*, our Supreme Court rejected the notion that robbery and narcotics sales automatically qualify as predicate offenses which confer a financial benefit to the putative gang, reasoning that such crimes may just as easily be committed for the personal gain of individual gang members rather than to benefit the gang as a whole. (*Cooper*, *supra*, 14 Cal.5th at pp. 743–744.) The court explained, "While robbery and the sale of narcotics typically provide a financial benefit to the *offender*, the record contains evidence that could rationally lead to a contrary finding regarding whether the fruits of the offenses were intended to or did benefit the *gang as a whole*." (*Id*. at p. 743.)

The prosecutor's evidence in that case also fell short of establishing the circumstances surrounding the predicate offenses, and because the jury had not been instructed under the new law (Assembly Bill 333), the appellate court applied the rule that it must " 'determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' " (*Cooper*, *supra*, 14 Cal.5th at pp. 742–743, quoting *People v. Mil* (2012) 53 Cal.4th 400, 417.)

Similarly, in *Hin*, the court found inadequate an expert's generic testimony that "drug sales and burglary 'generate[] revenue' and thereby 'support the gang,' " because the record contained no evidence that the specific drug sale or burglary offered as a predicate generated revenue for the gang as an organization. (*Hin*, *supra*, 17 Cal.5th at pp. 462–463.)

All but one of the predicate offenses in the case at bench suffer from the same infirmities. Lopez testified that firearms were considered shared property of DSSM members, safeguarded by those not on probation, and available for use by all members. Although this testimony provided general background on DSSM's practices, it did not establish that the firearms underlying Jorge Gonzales, Jr.'s, or Parra's convictions were possessed, distributed, or used for the gang's benefit. Although there was ample evidence

demonstrating that Parra and Gonzales, Jr., were DSSM gang members, "a jury could have reasonably concluded that the predicate offenses … were committed for personal gain alone."[11] (*Cooper*, *supra*, 14 Cal.5th at p. 744.)

In contrast, the prosecutor introduced evidence that Anthony Gonzales trafficked firearms from New Mexico into California and distributed them to Norteño gang members. Lopez identified Gonzales as a DSSM gang member and testified that Gonzales supplied firearms from out of state to the gang. This testimony provides clear evidence of a nonreputational benefit to the gang. Nevertheless, the statutes and instructions require "a pattern of criminal gang activity." Evidence of a single predicate offense is insufficient to establish the existence of the alleged gang under section 186.22.

Based on the foregoing, we conclude that the gang enhancements (§ 186.22, subd. (b)) and the gang-related firearm use enhancements (§ 12022.53, subd. (d) & (e)(1)), must be reversed, as well as the jury's verdict on count 7 for the substantive gang offense (§ 186.22, subd. (a)). The prosecutor may elect to retry these allegations. In light of our conclusion, Parra's remaining claims challenging the gang enhancements, including whether his current offenses were committed for the benefit of the gang, are moot. We therefore need not and do not address them.

### III. The Kill Zone Theory Instruction

Parra contends the trial court committed prejudicial error by instructing the jury on the kill zone theory. He argues the evidence was insufficient to support giving the instruction and that the modified version of the instruction was itself flawed. We agree

---

[11]    Lopez also described multiple home invasions he participated in, one of which occurred on New Year's Eve in 2017. But the prosecutor never made clear that she was relying upon this crime, or any of the other home invasions committed by Lopez and other gang member accomplices, in proving the pattern of criminal gang activity. Moreover, upon this record, we cannot be confident that the jury would have concluded that these home invasions were committed for the benefit of the gang rather than for personal benefit.

31.

error occurred in both respects, but conclude the errors were harmless beyond a reasonable doubt.

## A. *Background*

At the conclusion of the final discussion concerning the jury instructions, Parra's trial counsel stated he had no objections to the instructions as given, including the instruction on the kill zone theory.

Below is the optional bracketed kill zone pattern jury instruction for the kill zone theory of attempted murder liability:

> "[A person may intend to kill a primary target and also [a] secondary target[s] within a zone of fatal harm or 'kill zone.' A 'kill zone' is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target.

> "In order to convict the defendant of the attempted murder of <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>, the People must prove that the defendant not only intended to kill <insert name of primary target alleged> but also either intended to kill <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>, or intended to kill everyone within the kill zone.

> "In determining whether the defendant intended to kill <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>, the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone; and (2) <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory> was located within the kill zone.]" (CALCRIM No. 600.)

The trial court instructed the jury on attempted murder under CALCRIM No. 600, as modified to include the kill zone theory, as follows, with the portions Parra challenges shown in italics:

> "In order to convict the defendant of the attempted murder of *Omar Castaneda* and Jovina Mendoza, the People must prove that the defendant not only intended to kill Omar Castaneda but also either intended to kill Jovina Mendoza, or intended to kill everyone within the kill zone.

"In determining whether the defendant intended to kill *Omar Castaneda* and Jovina Mendoza, the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone [around Omar Castaneda]; and (2) *Omar Castaneda and* Jovina Mendoza were located within the kill zone." (Some capitalization omitted.)

In closing argument, the prosecutor asserted that Parra intended to kill Castaneda because he was a rival gang member, and that Parra was also guilty of attempting to murder Mendoza because, when Casarez fired four to six shots from an assault rifle into the passenger compartment of Castaneda's pickup truck, the act created a kill zone in which Mendoza was present. The prosecutor argued that Parra aided and abetted the attempted murders by directing the group's search for Castaneda, urging Casarez to shoot him, positioning the Toyota Camry to enable the shooting, and then driving away to dispose of the shell casings.

The prosecutor explained that the kill zone theory applied to the attempted murder of Mendoza. She never suggested that the theory could apply to either the lesser-included offense of attempted voluntary manslaughter, or to the attempted murder of Castaneda, the intended target of the attack.

Parra's trial counsel argued that Alberto was driving the Camry, and that Lopez had either lied or was mistaken about Parra's involvement. He did not address the kill zone theory.

Bautista's trial counsel similarly argued Bautista was merely a passenger who played no role in the shooting, and likewise did not address the kill zone theory.

Bautista's counsel further argued there was no evidence Bautista aided and abetted any crime or sat in the car with an intent to kill. He asserted Bautista's purpose was solely to transport a gun to Santana Felix's residence and that he harbored no homicidal intent. Counsel briefly addressed attempted voluntary manslaughter, explaining that if Castaneda flashed gang signs on the day of the incident, it could have provoked a heat of passion reaction, reducing attempted murder to attempted voluntary manslaughter. But, he raised this point only as a lesser included offense for the jury to consider, emphasizing

33.

that the prosecutor's theory of premeditation and deliberation was unsupported and that, at most, the evidence showed Parra made a snap decision and instructed others to shoot.

In rebuttal, the prosecutor reiterated that Parra aided and abetted the attempted murders by suggesting the group search for Castaneda, providing the weapon used in the drive-by shooting, driving the car, and directing Casarez to shoot.

## B. *General Principles of the Kill Zone Theory*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*), quoting *People v. Lee* (2003) 31 Cal.4th 613, 623.) "When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Canizales*, at p. 602.)

Our Supreme Court has recognized the concept of "concurrent intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder." (*Canizales*, *supra*, 7 Cal.5th at p. 602, italics omitted.) Under the kill zone theory, a defendant who targets a specific individual by intending to kill everyone in the area where that individual is located—the so-called "kill zone"—may be convicted of the attempted murder of secondary victims within that zone. (*People v. Bland* (2002) 28 Cal.4th 313, 330.)

Recognizing the potential for misapplication, the *Canizales* court clarified that the kill zone theory may be applied "only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located

34.

within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) "[T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Ibid*.)

The *Canizales* court further emphasized that when "the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, … evidence of a primary target is required." (*Canizales*, *supra*, 7 Cal.5th at p. 608.) " '[W]ithout a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent.' " (*Id*. at p. 609; *People v. Mumin* (2023) 15 Cal.5th 176, 193 (*Mumin*) ["Without substantial evidence showing the defendant acted with intent to kill a primary target, the essential basis for a concurrent intent analysis is not satisfied"].)

## C. *Standard of Review*

To determine whether the trial court properly instructed on the kill zone theory, we apply the substantial evidence standard of review. Under this standard, the question is whether the record contains evidence from which a reasonable jury could infer that the defendant intended to kill everyone within the zone of harm as a means of killing the primary target. (*Mumin*, *supra*, 15 Cal.5th at p. 203.) In making this determination, we view the entire record in the light most favorable to the judgment and ask whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (*Id*. at p. 199.)

In addition, when reviewing challenges to the wording of a jury instruction, we evaluate the instructions as a whole and ask whether there is a reasonable likelihood the

35.

jury misunderstood or misapplied the challenged language. (*People v. Nelson* (2016) 1 Cal.5th 513, 544.)

### D. *Analysis*

We conclude the trial court erred in two respects: first, by giving the kill zone instruction in the absence of sufficient evidence, and second, by modifying CALCRIM No. 600 in a way that risked conflating the primary target (Castaneda) with the secondary victim (Mendoza).

As to sufficiency, the circumstances here did not establish beyond a reasonable doubt that Casarez or his accomplices either (1) actually knew a second person was in Castaneda's truck, or (2) were consciously aware of a high probability that another person was present when Casarez opened fire. The prosecutor introduced no evidence that Casarez or his companions saw Mendoza before shooting, heard her voice, or otherwise had any reason to be aware of her actual presence. Nor did the circumstantial evidence support an inference that they were consciously aware another occupant was likely in the truck. The record is silent as to whether the Camry's occupants could see into the cab, and eyewitnesses testified extremely loud music was playing from Castaneda's truck, making it unlikely anyone inside could be heard. Finally, Mendoza's testimony that her position in the truck passenger seat, kneeling and leaning toward the center console, suggests she may not have been readily visible to occupants in approaching vehicles.

This evidentiary gap bears directly on whether the method of attack supported an inference of concurrent intent to kill all occupants, as opposed to a singular intent to kill Castaneda. In the absence of such evidence, we are skeptical that the kill zone instruction was warranted here. (*Canizales*, *supra*, 7 Cal.5th at p. 607 ["Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory"]; see also *People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1079 [disapproving use of the kill zone theory where one of multiple shots discharged hit an unseen victim in a shed where the target victim hid, explaining, "it is not possible to intend to kill someone

36.

in the vicinity of a target if the attacker has no knowledge that the person is present"]; cf. *People v. Vang* (2001) 87 Cal.App.4th 554, 564 [holding that the defendants demonstrated a deliberate intent to take human life, beyond the targeted person, by firing high-powered, wall-piercing firearms into inhabited dwellings]; see also *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023 [concluding that a defendant may be convicted of attempted murder under a kill zone theory even if unaware of the secondary victim's presence, provided the defendant recognized or accepted that anyone within the zone could or would die as a natural and probable consequence of his act].)

Separately, we conclude that the modified instruction compounded the error by inserting Castaneda's name, both the primary target and intended victim, into the paragraphs describing how to apply the kill zone theory. This wording blurred the distinction between the primary target and the secondary victim and risked suggesting that the jury could use the kill zone theory to establish intent to kill Castaneda himself.

Nevertheless, we are persuaded that both instructional errors were harmless beyond a reasonable doubt. (See *People v. Aledamat* (2019) 8 Cal.5th 1, 9, 13 [applying *Chapman* where alternative-theory error has occurred].) As to Castaneda, the prosecutor consistently argued that he was the intended target, a rival gang member whom Parra sought to kill, and explained that Parra aided and abetted the shooting by locating Castaneda's truck, supplying the firearm, and directing Casarez to open fire. The prosecutor never suggested that Castaneda's mere presence within a "kill zone" could establish the requisite intent to kill necessary to support a conviction for attempted premeditated murder. Given the prosecutor's emphasis on Parra's intent to kill Castaneda, the absence of any argument inviting reliance on a kill zone theory as to the attempted murder of Castaneda, and the ample trial evidence supporting this conclusion, there is no reasonable possibility the jury convicted on an invalid theory. Accordingly, we conclude that the instructional error identified was harmless beyond a reasonable doubt.

With respect to Mendoza, the jury acquitted Parra of attempted murder and instead found him guilty of attempted voluntary manslaughter, an offense that by definition requires a direct intent to kill under a mitigating circumstance and to which the kill zone theory does not apply.[12] By returning that verdict, the jury necessarily found that Parra personally harbored an intent to kill Mendoza while acting in the heat of passion, thereby rejecting any theory of concurrent intent authorized by the kill zone instruction.

Nothing in the record suggests that the prosecutor invited the jury to apply the kill zone theory to the voluntary manslaughter charge, and the instruction itself was expressly linked to the attempted murder count. Given the structure of the instructions and the distinct mental state requirements of the two offenses, there is no reasonable likelihood the jury relied on the kill zone instruction in convicting Parra of attempted voluntary manslaughter. Accordingly, although the trial court erred in both giving and modifying the kill zone instruction, we are persuaded beyond a reasonable doubt that neither error contributed to the verdicts on count 1 and 2. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

## IV. <u>Sufficiency of the Evidence Supporting Parra's Conviction for the Attempted Voluntary Manslaughter of Mendoza</u>

Parra argues there was insufficient evidence to support instructing the jury on attempted voluntary manslaughter, asserting that "[t]here was no evidence that Mendoza did anything that would provoke heat of passion …." He further contends that the evidence was insufficient to support his conviction for that offense because there was no

---

**12** Attempted voluntary manslaughter requires proof that the defendant specifically intended to kill the named victim, although the intent is mitigated by heat of passion or imperfect self-defense. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 583.) The kill zone theory, by contrast, is a method of proving concurrent intent to kill multiple victims to ensure the death of the primary target. (See *Canizales*, *supra*, 7 Cal.5th at pp. 596–597.) The two concepts are incompatible. A person who acts without reflection in response to adequate provocation does not act with malice. (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) In addition, the mitigating circumstances that reduce an intentional killing from murder to voluntary manslaughter must be tied to the particular victim the defendant intended to kill. (See *People v. Choyce* (2025) 18 Cal.5th 86, 105.)

proof that he or his accomplices "acted under the actual influence of a strong passion or emotion." We agree with Parra and conclude that his conviction on count 2 for attempted voluntary manslaughter must be reversed.

### A. *Applicable Law: Attempted Voluntary Manslaughter*

Attempted voluntary manslaughter is a lesser included offense of attempted murder, distinguished only by the absence of malice. (*Beltran*, *supra*, 56 Cal.4th at p. 942; *People v. Avila* (2009) 46 Cal.4th 680, 705.) Malice may be negated by either heat of passion or imperfect self-defense, but in both circumstances the offense still requires proof of the intent to kill. (See *Beltran*, at p. 942; see also *People v. Montes* (2003) 112 Cal.App.4th 1543, 1546–1552 [heat of passion negates malice aforethought but does not negate the intent to kill].) Stated plainly, attempted voluntary manslaughter reduces attempted murder without altering the requirement of intent to kill; the only difference lies in the presence of a mitigating circumstance.

The record, including the jury's verdict, confirms that Parra was convicted of attempted voluntary manslaughter under a heat of passion theory. Neither party argued that Parra or his accomplices acted in imperfect self-defense.

When liability is premised on aiding and abetting under this theory, the prosecutor must prove the aider and abettor personally intended to kill the victim and either acted, or aided another in acting, while under the influence of a legally sufficient provocation. (See *People v. Concha* (2009) 47 Cal.4th 653, 661–662; see also *People v. Martinez* (2024) 106 Cal.App.5th 892, 902 ["Just as the aider and abettor of attempted voluntary manslaughter must have had an independent intent to kill, he must also have reacted in a heat of passion that would have mitigated his intent to kill"].)

"The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee* (1999) 20 Cal.4th 47, 59 (*Lee*); accord, *People v. Trinh* (2014) 59 Cal.4th 216, 233.)

39.

### B.  *Substantial Evidence/Standard of Review*

The standard for assessing a sufficiency of the evidence claim is highly deferential.  We examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence; that is, evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (See *People v. Cravens* (2012) 53 Cal.4th 500, 507; see also *People v. Kurey* (2001) 88 Cal.App.4th 840, 848–849 [we "resolve all inferences and intendments in favor of the judgment," and "all conflicting evidence will be resolved in favor of the decision"].)

In conducting our review, we must presume in support of the judgment the existence of every fact the trial court could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919, superseded by statute on other grounds as stated in *Hin*, *supra*, 17 Cal.5th at p. 441.)  We also accept all logical inferences the trial court could have drawn from circumstantial evidence.  (*People v. Flores* (2020) 9 Cal.5th 371, 411.)

The question is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence supports the trier of fact's finding.  (See *People v. Crittenden* (1994) 9 Cal.4th 83, 139.)  As such, a party challenging the sufficiency of the evidence bears a heavy burden.  The judgment must be upheld unless it appears that, under no hypothesis whatsoever, is there sufficient substantial evidence to support it. (*People v. Cravens*, *supra*, 53 Cal.4th at p. 508; *People v. Sanchez* (2003) 113 Cal.App.4th 325, 329.)

### C.  *Analysis*

The jury convicted Parra, as an aider and abettor, of the attempted voluntary manslaughter of Mendoza, necessarily finding that he shared the direct intent to kill her under a legally recognized mitigating circumstance.  (*Beltran*, *supra*, 56 Cal.4th at p. 942; *People v. Rios* (2000) 23 Cal.4th 450, 461.)  The record, however, contains no evidence that anyone in Parra's vehicle saw Mendoza in Castaneda's truck or was otherwise aware

40.

of her presence before the shooting. Without such evidence, the jury could not reasonably infer that Parra, or Casarez, the principal he aided and abetted, intended to kill Mendoza.

Nor does the record establish legally sufficient provocation by Mendoza. Castaneda allegedly flashed gang signs or displayed a firearm the day before or just prior to the shooting, but Mendoza engaged in no provocative conduct, and there is no evidence that Parra or his companions reasonably believed she had.[13] Because provocation is victim specific (see *Lee*, *supra*, 20 Cal.4th at p. 59), Parra's liability as an aider and abettor on a heat of passion theory required proof that he personally intended to kill Mendoza and formed the intent while under a heat of passion circumstance attributable to Mendoza. (*People v. Martinez*, *supra*, 106 Cal.App.5th at p. 902.) Provocation cannot, as the Attorney General suggests, have "flowed through Castaneda[.]"

The record contains no such proof. Accordingly, the evidence is insufficient to support the jury's verdict finding Parra guilty of attempted voluntary manslaughter on count 2.

The Attorney General maintains that because the jury convicted Parra of the willful, deliberate, and premeditated attempted murder of Castaneda, it is "indisputable" that [Parra] was guilty of the attempted murder of Mendoza under a kill zone theory. But a conviction as to the primary target does not itself establish the concurrent intent that the kill zone doctrine requires, specifically, an intent to kill everyone within the zone of fatal harm as the means of ensuring the target's death. (See *People v. Bland*, *supra*, 28 Cal.4th at pp. 330–331; *Mumin*, *supra*, 15 Cal.5th at pp. 204–205.) Here, the record does not supply evidence of such an intent.

---

[13] There is also scant evidence that Parra or his companions acted under the influence of a strong passion induced by provocation. (See *People v. Moye* (2009) 47 Cal.4th 537, 550 [subjective component of heat of passion requires evidence that the defendant acted under the actual influence of a strong passion induced by provocation].)

Nor does the jury's verdict finding Parra guilty of a lesser verdict as to Mendoza salvage the conviction. Attempted voluntary manslaughter required proof that Parra intended to kill Mendoza and formed that intent under a heat of passion circumstance attributable to her; provocation is victim-specific. (See *Lee*, *supra*, 20 Cal.4th at p. 59.) As discussed, the record contains no such showing. Thus, even assuming, as the Attorney General suggests, that the jury's verdict on count 2 reflected an act of lenity, that assumption does not cure the evidentiary gap in this record.[14]

The question then becomes the appropriate remedy. Although the trial evidence supports a conviction of assault with a firearm, it is not a lesser included offense of attempted voluntary manslaughter. The assault with a firearm offense includes elements, including the use of a firearm and the present ability to apply force, that are not required for attempted voluntary manslaughter, whereas the attempted voluntary manslaughter offense requires a specific intent to kill that assault does not. We therefore cannot modify the verdict on count 2 by reducing the conviction to assault with a firearm. (See § 1181, subd. 6.)

Notwithstanding, there is ample evidence to support a conviction of assault with a firearm. The proper course is therefore to reverse the conviction for attempted voluntary manslaughter on count 2 and remand the matter for further proceedings at the prosecutor's election. (See § 1262.)

## V.    Failure to Instruct the Jury on CALCRIM No. 334 on Counts 8 Through 11

Lopez, who took part in both the February 19, 2018 Olympia Street shooting of Castaneda and Mendoza and the April 11, 2018 Avon Street home invasion, testified at trial. The trial court instructed the jury with CALCRIM No. 335 (accomplice testimony as a matter of law) for the attempted murders (counts 1 & 2), shooting at an occupied

---

[14]    Parra contends his conviction on count 2 for attempted voluntary manslaughter is incorrectly reflected in the abstract of judgment and that his sentence on this count is unauthorized. Because we conclude the conviction must be reversed and the matter remanded for a full resentencing hearing, this claim is moot.

motor vehicle (count 3), robberies (counts 4 & 5), and gang participation charges (count 7), but not for the unlawful possession of a firearm and ammunition charges (counts 8–11). This instruction informed the jury to view with caution any testimony that tended to incriminate Parra and to require supporting evidence that independently connected Parra to those offenses before relying on Lopez's testimony to convict.

According to Parra, Lopez's testimony established that Lopez was also an accomplice to the firearm and ammunition offenses. During the Olympia Street shooting, Lopez handed the AR rifle to Casarez after Parra ordered the shooting, which, in Parra's view, made Lopez an aider and abettor to Parra's constructive or joint possession of the gun and ammunition (counts 8 & 9). Likewise, during the Avon Street home invasion, Lopez testified that he accompanied Parra and others to retrieve the rifle from a car trunk after they planned the crime. Parra argues this testimony made Lopez an accomplice to the unlawful possession offenses arising from that event (counts 10 & 11). He therefore contends the trial court had a sua sponte duty to instruct the jury on accomplice testimony as to counts 8 through 11.

The Attorney General responds that Lopez's actions did not constitute aiding and abetting the possession crimes. According to the Attorney General, handing a firearm to another person at the direction of the possessor or accompanying a possessor when he retrieves a weapon does not amount to aiding and abetting unlawful possession. Moreover, accomplice liability for possession required proof that Lopez specifically intended to assist Parra's unlawful possession of firearms and ammunition, which in turn depended on Lopez knowing facts that made Parra's possession unlawful, specifically that Parra was a felon prohibited from possessing such items. Parra acknowledges that direct evidence of such knowledge does not appear in the record. Because Lopez could not have been an accomplice to counts 8 through 11 without that knowledge, the Attorney General submits that the trial court had no duty to instruct the jury with CALCRIM No. 334 as to those counts.

We conclude that Parra's claim is meritless.

43.

## A. *Background*

For the Olympia Street shooting (counts 8 & 9), the prosecutor argued that Parra constructively possessed the assault rifle and ammunition because he knowingly entered the car with the weapon, knew he was prohibited from possessing firearms based on his prior felony conviction, and exercised control over the rifle by ordering Casarez to shoot Castaneda.

For the Avon Street home invasion (counts 10 & 11), the prosecutor argued that Parra was involved in planning the crime, drove his accomplices to a location where Norteño gang firearms were stored, personally retrieved the AR rifle, and armed his codefendants before sending them into the residence. Although he remained in the car, the prosecutor contended that Parra directed the robbery, shared in the proceeds, and therefore possessed both the firearm and the ammunition in it.

## B. *Applicable Law*

Section 1111, which underlies CALCRIM No. 334, bars a conviction based solely on the uncorroborated testimony of an accomplice. Corroborating evidence must do more than raise a mere suspicion of guilt, but it may be slight and need not be strong or independently persuasive. (*People v. Trujillo* (1948) 32 Cal.2d 105, 110–111.)

An "accomplice" is one who could be prosecuted for the identical offense charged against the defendant, either as a direct perpetrator or as an aider and abettor. (§ 31; *People v. Avila* (2006) 38 Cal.4th 491, 564.) California law places the burden on the defendant to prove a witness's accomplice status, because that issue is collateral to guilt and not an element of the charged offense. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 963–968.)

## C. *Standard of Review*

We review claims of instructional error de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) In a criminal case, the trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence and necessary to the jury's understanding of the case. (*People v. Martinez* (2010) 47 Cal.4th 911, 953.)

The correctness of jury instructions is determined by considering the charge as a whole, not by viewing individual instructions in isolation. (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)

### D. *Analysis*

We conclude the trial court did not have a sua sponte duty to instruct on accomplice testimony with respect to the unlawful possession counts (counts 8–11). To be deemed an accomplice under section 1111, a witness must be liable to prosecution for the identical offense as the defendant, either as a perpetrator or as an aider and abettor. (§ 1111.) Parra argues that Lopez's conduct, handing Casarez the firearm during the Olympia Street shooting and accompanying Parra to obtain the rifle used in the Avon Street home invasion, made him an accomplice to the possession crimes.

Whether a witness is an accomplice is offense specific and turns on whether the witness was "liable to prosecution for the identical offense" as a principal or as an aider and abettor. (§ 1111; *People v. Johnsen* (2021) 10 Cal.5th 1116, 1155 (*Johnsen*).) To aid and abet, the witness must know the perpetrator's unlawful purpose and intend to facilitate that crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

Because the possession offenses are status based, Lopez would qualify as an accomplice only if the evidence showed that he knew Parra was legally barred from possessing firearms or ammunition and intended to assist him in doing so. Absent proof that Lopez knew of Parra's prohibited status, his brief handling of or mere proximity to a firearm could amount to, at most, assistance in ordinary possession, which is not inherently unlawful for a nonprohibited person and would establish, if anything, Lopez's independent liability for the same section 29800 and 30305 offenses.

On this record, there is insufficient evidence showing that Lopez knew Parra was a prohibited possessor. Parra suggests we may infer as much from the longstanding relationship between the two. But a close relationship, even one that includes shared criminal activity, does not establish knowledge of a status element. Nothing shows Lopez was told Parra had suffered a felony conviction, observed any court proceedings,

saw paperwork reflecting a firearms prohibition, or otherwise had reason to know that Parra was legally barred from possessing firearms or ammunition.

At most, the evidence shows that Lopez socialized with Parra, discussed guns, and helped retrieve or handle a weapon during the charged incidents. Those facts do not supply a reasonable inference that Lopez knew the circumstance that made Parra's possession unlawful, as opposed to ordinary possession. Because the evidence is insufficient as a matter of law to support a finding that Lopez was an accomplice to the possession counts, we conclude that the trial court had no sua sponte duty to instruct on accomplice testimony as to counts 8 through 11. (*Johnsen*, *supra*, 10 Cal.5th at p. 1155.)

Even assuming the trial court erred by failing to instruct the jury with CALCRIM No. 334 as to counts 8 through 11, we conclude it is not reasonably probable that the omission affected the verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The jury was expressly instructed under CALCRIM No. 335 to treat Lopez as an accomplice whose testimony implicating Parra should be viewed with caution and required corroboration for the more serious charges, including the attempted murders, robberies, and gang offenses. It is unlikely the jury would have compartmentalized its assessment of Lopez's credibility by applying the instruction to some counts but not others, particularly since the same witness testified to all of the charged events.

Further, independent evidence, including surveillance footage and GPS data showing Parra's vehicle near the crime scenes, corroborated portions of Lopez's account and tended to connect Parra to possession of the weapon and ammunition. Considering this corroboration, the jury's verdicts on the more serious offenses, and its awareness that Lopez was both a convicted felon and a participant in many of the charged crimes, which provided ample reason to view his testimony with caution, it is not reasonably probable that inclusion of the accomplice instruction on counts 8 through 11 would have affected the outcome.

## VI.    Prosecutorial Error in Closing Argument

Parra contends the prosecutor committed misconduct during her comments in closing argument by telling the jury 23 times that a guilty verdict was the "only reasonable verdict."  He argues this language improperly lessened the prosecution's burden of proof, similar to the error identified in *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*) where our Supreme Court held it was improper for the prosecutor to argue that guilt was the only reasonable view of the evidence.  (*Id.* at p. 672.)  Parra further maintains that trial counsel was ineffective for failing to object.  Following our independent review of the prosecutor's comments in closing argument, we find Parra's claim meritless.

### A.    *Background*

In her initial comments in closing argument, the prosecutor explained the People's burden of proof, stating:  "Reasonable doubt, that is the People's burden.  That is my burden to prove this case to you.  And reasonable doubt is one that leaves you with an abiding conviction that the charge is true.  And it need not eliminate all possible doubt."  She then reviewed the elements of each offense and enhancement, and in doing so frequently told the jurors that "the only reasonable verdict" for each count was guilty or that "the only reasonable verdict" on an enhancement was true.  Before making this point for each individual count at the conclusion of her argument, she again reminded the jurors:  "It is the People's burden to prove beyond a reasonable doubt; and therefore, it is the People's burden to be as thorough as possible for you, members of the jurors."

Trial counsel for Parra and trial counsel for Bautista emphasized the reasonable doubt standard in detail during their closing arguments, repeatedly reminding jurors that guilt had to be established beyond a reasonable doubt.

In rebuttal, the prosecutor again reminded the jury:  "The People have the sole burden of proof to prove the case beyond a reasonable doubt.  The only burden is on the People," before discussing the standard once more.  She concluded by stating, with

47.

respect to the charged crimes and enhancements, that "[t]he only reasonable verdict that the facts and evidence actually support is a verdict of guilty and the enhancements true."

The trial court further instructed with CALCRIM No. 103 on the presumption of innocence and CALCRIM No. 220, which defined proof beyond a reasonable doubt using the "abiding conviction" formulation and explained that the jury must acquit unless the People met that burden.

### B. *Ineffective Assistance of Counsel*

To preserve a claim of prosecutorial misconduct for appellate review, "a defendant must object and request that the jury be admonished concerning the misconduct." (*People v. Peterson* (2020) 10 Cal.5th 409, 464; *Johnsen*, *supra*, 10 Cal.5th at p. 1164, quoting *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 ["It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal"].)

Parra failed to object at trial to the portions of the prosecutor's closing argument he now claims constitute prejudicial misconduct. Although a timely objection and request for admonition may be excused where either would have been futile or an admonition would not have cured the harm (see *Johnsen*, *supra*, 10 Cal.5th at p. 1164), the record does not support either exception here. Parra does not contend otherwise. We therefore conclude that Parra's claim is forfeited.

Parra alternatively contends that trial counsel rendered ineffective assistance by failing to object. (See *Centeno*, *supra*, 60 Cal.4th at p. 674, quoting *People v. Lopez* (2008) 42 Cal.4th 960, 966 [" 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel' "].) We therefore consider whether counsel's failure to object constituted deficient performance under *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*)).

48.

To prevail on a claim of ineffective assistance of counsel, an appellant is required to make a two-part showing. (See *People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds by *People v. Delgado* (2017) 2 Cal.5th 544, 559 [the defendant has the burden of proving ineffective assistance of counsel].) First, they must establish that "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms[.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 519–520.) Second, they must show that trial counsel's deficient performance was prejudicial. (*Id*. at p. 520.)

Prejudice must be affirmatively demonstrated. The record must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.)

" 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105, quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371.) "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Harrington*, at p. 104.) Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." (*Id*. at p. 112.)

### C. *Applicable Law: Prosecutorial Misconduct*

The standard for establishing prosecutorial error is well established. (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) A prosecutor violates the federal Constitution when their conduct reflects a pattern of serious and egregious behavior that renders the trial fundamentally unfair and infringes upon the defendant's right to due process. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 854.) To rise to the level of a federal violation, "the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1202, quoting *United States v. Agurs* (1976) 427 U.S. 97, 108.) However, even if the conduct does not violate constitutional standards, a prosecutor's remarks may still

49.

contravene state law if they involve "deceptive or reprehensible methods to persuade the court or jury." (*People v. Watkins* (2012) 55 Cal.4th 999, 1031; accord, *Daveggio and Michaud*, at p. 854.)

When challenging a prosecutor's remarks to the jury, the defendant must demonstrate that, " '[i]n the context of the whole argument and the instructions,' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.) "If the challenged comments, viewed in context, 'would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 130, quoting *People v. Benson* (1990) 52 Cal.3d 754, 793.) In conducting this analysis, courts " ' "do not lightly infer" ' " that the jury adopted the most damaging interpretation of the prosecutor's comments. (*Centeno*, at p. 667.)

### D. *Analysis*

Our Supreme Court has made clear that "it is error for the prosecutor to suggest that a 'reasonable' account of the evidence satisfies the prosecutor's burden of proof." (*Centeno*, *supra*, 60 Cal.4th at p. 672, italics omitted.) The prosecutor here made no such comments. She repeatedly emphasized that the People bore the burden of proving guilt beyond a reasonable doubt, and the trial court correctly instructed the jury on that standard. In this context, nothing in the challenged remarks could reasonably be understood as inviting conviction based only on a "reasonable" view of the evidence.

Notwithstanding, considering the parties' repeated explanations of the beyond a reasonable doubt standard, the trial court's correct description of that burden, and the court's instructions directing the jury to apply it, we conclude there is no reasonable probability of a different outcome had trial counsel objected to or sought an admonition regarding the prosecutor's challenged comments. (See *Strickland*, *supra*, 466 U.S. at p. 694.) The jurors were repeatedly admonished that the prosecutor bore the sole burden of proving guilt beyond a reasonable doubt, and we presume they followed the court's

instructions. As our Supreme Court has explained, " '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Cortez*, *supra*, 63 Cal.4th at p. 131, quoting *People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.)

Based on the foregoing, we conclude that trial counsel's failure to object to the prosecutor's cited comments did not prejudice Parra. Parra has demonstrated neither error, nor prejudice assuming error.

## VII.   Ruling Limiting Recross-examination of Lopez

Lopez initially told Dias that the Morris Market incident, where Castaneda flashed gang signs and a gun, occurred immediately before the shooting. At trial, however, Lopez testified that he could not recall when that incident occurred. Trial counsel attempted to impeach him with his prior statement, but the court sustained objections, ruling it had to come through Dias. Both sides questioned Lopez about the inconsistency, and Dias later testified to the statement.

Parra contends the trial court abused its discretion and violated his state and federal confrontation rights by limiting his impeachment of Lopez. Upon this record, we are persuaded that any presumed error is harmless beyond a reasonable doubt.

### A.   *Background*

On direct examination, Lopez stated that on February 19, 2018, he, Parra, Bautista, and Casarez met at a residence on Glenn Avenue and then left in a car to deliver a "mini AR" assault rifle. He said they drove west on Glenn Avenue, north on Seattle Street, west on Butte Avenue, and south on Olympia Street, where they made a U-turn and then shot at Castaneda. He made no mention of Castaneda taunting them at Morris Market.

On cross-examination, Parra's trial counsel emphasized that Lopez faced 25 years in prison for his role in the charged crimes and other cases, but had secured probation in exchange for testifying against Parra and others.

When asked if he told officers that the Morris Market incident, where Castaneda taunted Parra and the others while flashing a gun, occurred immediately before the

51.

shooting, Lopez initially claimed not to remember. After reviewing the transcript, however, he admitted making that statement. Trial counsel pressed him on the inconsistency, suggesting the Morris Market incident may have taken place a day or more before the shooting, and Lopez conceded he was unsure whether it happened the day of the shooting or earlier.

On redirect examination, Lopez said he believed the Morris Market incident occurred on a prior day.

Trial counsel confronted Lopez about other inconsistencies between his trial testimony, prior statements, and preliminary hearing testimony. Lopez claimed that Castaneda had disrespected the group "multiple times" at Morris Market and elsewhere, but he could not recall if the incident in question happened on the day of the shooting. Lopez subsequently claimed that Castaneda had been disrespecting the group by flashing gang signs and laughing at them for years.

When the prosecutor returned to the Morris Market incident, Lopez reiterated that Castaneda had disrespected Parra's group five or six times and that the Morris Market incident occurred on a different day than the Olympia Street shooting.

Parra's counsel again challenged Lopez with his October 2018 statement to detectives suggesting the Morris Market incident occurred immediately before the shooting. After reviewing the transcript, Lopez admitted he had previously told detectives that Castaneda brandished a gun at Morris Market on the day of the shooting, that Parra's group followed Castaneda, and that Casarez opened fire after Castaneda pulled over. On further questioning, however, Lopez equivocated, ultimately admitting he was "confused" about whether the Morris Market incident was separate from the shooting.

The prosecutor later had Lopez confirm that, based on the Richie's Market surveillance video, the route driven on the day of the shooting differed from the route he originally described after the Morris Market incident. Dias testified that Lopez first told him in October 2018 that the shooting occurred just after Castaneda had flashed a pistol

52.

and made gang signs at Morris Market, but Dias also confirmed that Lopez gave a different account at the preliminary hearing.

In closing, trial counsel attacked Lopez's credibility, arguing that his testimony was "at least very confused" and inconsistent with his prior statements and with surveillance video that partially depicted Parra's driving route. Counsel argued Lopez conflated multiple encounters with Castaneda at Morris Market and elsewhere, and admitted he was "confused." According to counsel, the identity of the shooters therefore rested on a witness "who really doesn't know what happened[.]" The prosecutor, in rebuttal, conceded Lopez had difficulty separating the Morris Market incident from the shooting.

### B. *Applicable Law*

Under California law, impeachment with a prior inconsistent statement is governed by Evidence Code sections 770 and 1235. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219.) The process is straightforward. When a witness gives testimony that conflicts with an earlier statement, the opposing party may confront the witness with the prior statement and must first provide an opportunity to explain or deny it. (§ 770, subd. (a).) If the witness admits making the statement, the impeachment is complete. If the witness denies the statement or claims not to recall it, the prior statement may then be proved by extrinsic evidence.

Once the foundational requirements of section 770 are met, the prior inconsistent statement is admissible both to impeach the witness and for the truth of the matter asserted. (Simons, Cal. Evidence Manual (2025) § 2:42, p.139; Evid. Code, § 1235.)

### C. *Analysis*

Under Evidence Code section 770, a witness must first be confronted with a prior statement and given an opportunity to admit, deny, or explain it. If the witness denies or claims not to recall the statement, its contents may then be proved by extrinsic evidence through the testimony of someone who personally heard or recorded the prior statement. (Evid. Code, §§ 770, 1235.) Counsel's questions, even when quoting from a document,

are not evidence and cannot establish that the statement was made. (*People v. Kiney* (2007) 151 Cal.App.4th 807, 814–815.)

Although Evidence Code section 770 does not prohibit quoting a prior statement verbatim when confronting a witness, doing so would have added little here, since counsel still had to establish through competent evidence that the prior statement was in fact made, particularly in light of Lopez's limited recollection regarding the timing of the taunting incident. The trial court's direction that counsel "go through the detective first" accurately reflected this procedure.

Once Lopez either denied or claimed not to recall making certain statements to police, those statements could be introduced only through a witness with personal knowledge, such as Dias, who conducted the interview. Because the transcript had not been authenticated, trial counsel could not properly read from it in front of the jury to prove that the prior statement was made. (Evid. Code, §§ 770, 1401.) The trial court did not prohibit impeachment; it simply required compliance with the statutory process that distinguishes between confronting a witness and proving the prior statement through admissible evidence.

Even assuming the trial court erred in limiting the form of impeachment, however, we conclude that any error was harmless under either the state or federal standard. The jury heard that Lopez initially told police the Morris Market incident occurred immediately before the Olympia Street shooting. At trial, Lopez acknowledged making that statement after his recollection was refreshed, and Dias later confirmed the same point in his testimony. Trial counsel also relied on these inconsistencies in closing argument to challenge Lopez's credibility. We conclude that on this record, any limitation on the form of impeachment could not have affected the verdict. (See *Chapman*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## VIII. **The Trial Court's Exclusion of the Defense Expert's Testimony**

Parra contends the trial court committed reversible error by excluding his defense expert as a discovery sanction. The Attorney General responds that because the expert

was not disclosed until the 17th day of trial, the court acted within its discretion in precluding the testimony. Given trial counsel's untimely disclosure and the court's broad authority to manage discovery, we conclude Parra has not established that the court's ruling constituted an abuse of discretion. We further conclude that any presumed error is harmless beyond a reasonable doubt.

### A. *Background*

On June 4, 2021, the jurors were sworn in.

On June 7, 2021, during his opening statement, trial counsel told jurors they would see from the Richie's Market surveillance video that Alberto, not Parra, was driving the car used in the Olympia Street shooting. He promised the jury the video showed Alberto's face and stature, not Parra's.

On July 12, 2021, trial counsel informed the court he intended to call Brent Turvey, a criminalist, to testify as a forensic photographic analyst. Turvey's proposed testimony was that size and measurement comparisons between Parra, Alberto, and the car excluded Parra as the driver. Counsel admitted he hired Turvey after trial began and did not disclose him earlier because Turvey had not yet formed an opinion. Counsel also sought to introduce work by defense investigator Rich Paloma, who had not been previously disclosed or identified in any reports.[15]

The prosecutor objected under section 1054, citing repeated late discovery by trial counsel. She represented that she had only learned of Turvey's analysis on the Friday before the instant hearing.

The prosecutor further explained she had been provided only 10 PowerPoint slides, with no foundation, reports, or methodology disclosed. The slides themselves contained speculative language such as "it appears" and "it could," and the measurements appeared to be taken from photographs rather than the actual vehicle, which remained in

---

[15] Parra does not challenge the exclusion of his proposed defense investigator, who would have introduced a photograph showing the presence of an outdoor surveillance camera at the Denny's restaurant, offered to establish that such a camera existed.

police custody.  She also emphasized that trial counsel had long known Alberto owned the car Parra had been driving and that Lopez's 10-hour interview with police on January 31, 2020, contained extensive discussion of whether he was the driver.

Trial counsel responded that he had requested access to the car but, when denied, used another 1998 Camry for measurements.  Although he initially claimed the issue arose only during trial, he also acknowledged knowing "a long time ago" that Alberto owned the car, and said he realized the similarity only after viewing Alberto's photograph online during trial.

The trial court concluded the disclosure was untimely, found that the People would have no fair opportunity to rebut, and denied counsel's request to call Turvey or Paloma. Later, the prosecutor set forth in detail the defense's repeated and ongoing discovery violations.

### B.  *Applicable Law*

Under section 1054.3, subdivision (a), the defense must disclose to the prosecution the names and addresses of persons, other than the defendant, that it intends to call as witnesses at trial and their written or oral statements.  (*People v. Riggs* (2008) 44 Cal.4th 248, 305–306.)  The phrase "intends to call" means persons the party reasonably anticipates it is likely to call at trial.  (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 375–376 & fn. 11.)  A witness need not be disclosed by the defense until the decision to call that witness is final.  (*Hubbard v. Superior Court* (1997) 66 Cal. App. 4th 1163, 1170.)  The disclosure must be made 30 days before trial or, if counsel becomes aware of a witness after that time, immediately.  (§ 1054.7.)

Section 1054.5, subdivision (b), provides in part that "Upon a showing that a party has not complied with Section … 1054.3 and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the

testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order."

While excluding a witness's testimony is a sanction of last resort (see § 1054.5, subd. (c)), a party's willful failure to comply with discovery obligations in order to gain a tactical advantage may justify exclusion. (*People v. Jackson* (1993) 15 Cal.App.4th 1197, 1203.) Courts have also recognized that, in some circumstances, sanctions short of exclusion "would perpetuate 'prejudice to the State and … harm to the adversary process.' " (*Ibid.*, quoting *Taylor v. Illinois* (1988) 484 U.S. 400, 413.)

Some courts have held however that excluding a witness's testimony is improper absent a showing of significant prejudice to the opposing party and willful misconduct by the party offering the evidence. (*People v. Jordan* (2003) 108 Cal.App.4th 349, 358; *People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1758.)

" '[A] trial court may, in the exercise of its discretion, "consider a wide range of sanctions" in response to [a] violation of a discovery order.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 299.) " 'We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard.' " (*People v. Lamb* (2006) 136 Cal.App.4th 575, 581.)

### C. *Analysis*

Trial counsel represented that he hired Turvey after trial began, did not disclose his presence until weeks later, and provided the prosecutor only 10 PowerPoint slides without reports, methodology, or foundational data. Simultaneously, counsel also attempted to introduce a second previously undisclosed investigator, Paloma.

Although he claimed the issue of Parra's role as driver arose only during trial, the record shows trial counsel had long known that Alberto owned the vehicle and had access to discovery materials in which Lopez discussed Alberto's possible involvement in the drive-by shooting. Indeed, during his comments in opening statements, trial counsel told the jury that surveillance video would show Alberto rather than Parra driving on the day of the drive-by shooting incident.

Based on the foregoing, we conclude that the trial court acted within its discretion by finding trial counsel's late disclosure untimely and prejudicial, as the prosecutor had no meaningful opportunity to rebut or investigate Turvey's proposed testimony.

We recognize however that the trial court failed to make an explicit finding that counsel's nondisclosure was willful. Some case authority indicates that such a finding is a necessary prerequisite to excluding a proffered witness's testimony. (See *People v. Gonzales*, *supra*, 22 Cal.App.4th at p. 1758.) Although exclusion of Turvey's testimony appears justified under the circumstances, we will presume error out of an abundance of caution. We find the presumed error harmless beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. at p. 24.

Turvey would have testified that, after comparing photographs of Parra and Alberto and their respective heights, and after estimating the interior dimensions of the suspect vehicle using a similar make and model, the driver depicted in the Richie's Market surveillance video was Alberto, not Parra. Although this testimony supported the defense theory, its underlying components were based on the same surveillance video and readily observable features of the two individuals, which the jury was equally capable of assessing. We further observe that Lopez offered detailed testimony identifying Parra as the driver. His testimony was subject to cross-examination, and the jury was tasked with assessing his credibility and the weight of his statements. Considering the video evidence and Lopez's testimony, any presumed error was clearly harmless beyond a reasonable doubt.

## IX.     The Firearm Use Enhancement Attached to Counts 4 and 5

Parra contends, and the Attorney General agrees, that the firearm use enhancements imposed under section 12022.53, subdivision (b), attached to counts 4 and 5 must be stricken. These counts represent the two counts of first degree robbery in connection with the Avon Street home invasion.

We agree with the parties. The evidence established that Parra did not enter the Avon Street residence during the April 11, 2018 home invasion. Instead, he remained outside while his three coparticipants went inside and carried out the crimes.

As CALCRIM No. 3146 explains: "Someone *personally uses* a firearm if he or she intentionally does any of the following: [¶] 1. Displays the weapon in a menacing manner; [¶] 2. Hits someone with the weapon; [¶] OR [¶] 3. Fires the weapon." Parra accomplished none of these acts. The evidence showed only that he armed his companions and waited in the getaway vehicle.

And, because section 12022.53, subdivision (b), requires proof that the defendant *personally* used a firearm, the enhancement cannot be sustained based on the conduct of other principals. (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1058.) Accordingly, the enhancements attached to counts 4 and 5 must be stricken.

## X.     The Trial Court's Failure to Give a Unanimity Instruction on Count 12

Parra argues the trial court erred by failing sua sponte to give a unanimity instruction on count 12, his conviction for the unlawful possession of ammunition. He claims the jurors could have disagreed on which specific act supported guilt because there were three separate potential acts of possession arising from ammunition in his residence, his car, and in the adjacent vacant lot.

The Attorney General submits that no unanimity instruction was required because (1) section 30305 criminalizes simultaneous possession of ammunition as a single offense, regardless of type or location; (2) the evidence here showed one continuous course of conduct arising from the search of Parra's residence and surrounding property on a single date; and (3) the prosecutor elected to rely on all the ammunition found in arguing the charge. The Attorney General further contends that even if a unanimity instruction should have been given, any error was harmless beyond a reasonable doubt because the jurors necessarily agreed he possessed all of the ammunition if he possessed any.

We agree with the Attorney General that although a unanimity instruction was required, the trial court's failure to give such an instruction was harmless beyond a reasonable doubt.

### A. *Background*

On January 3, 2019, law enforcement conducted aerial surveillance of the residence at 1309 Inyo Avenue because, despite an active warrant for his arrest, Parra had not yet been apprehended. A bedroom inside the residence contained paperwork and other belongings associated with Parra, and a Range Rover registered to him was parked outside. Sheriff's deputies believed Parra resided at the residence.

While surveilling the residence, sheriff's deputies observed DSSM gang members Yepez and Arreola transferring rifles to a transient person on a vacant lot at 1313 Inyo Avenue, where the rifles were wrapped in a blue tarp and buried. Both properties were later searched pursuant to warrants.

In the backyard of 1309 Inyo Avenue and on the adjacent lot, deputies found a large cache of firearms and ammunition, including AR-15 style assault rifles (one short-barreled), at least three handguns, loaded magazines, boxes of .223/5.56-caliber ammunition, and spent casings. Several of the recovered firearms matched weapons depicted in photos from Parra's Instagram account, including images taken inside his residence.

At 1309 Inyo Avenue, Parra's green Range Rover and a black Infiniti sedan believed to be his were parked outside. Inside the black Infiniti, deputies found a secret compartment containing handgun magazines, at least one loaded, along with a phone, a plastic baggie with ammunition, and cash.

The prosecutor relied on all ammunition recovered from the Infiniti and the vacant lot to support count 12. In closing, she characterized the cache of guns and ammunition as DSSM's inventory tied to Parra's residence and vehicles, stating that on January 3, 2019, the sting unit "came upon, essentially, most of the [DSSM] Norteños's gun

inventory and ammo inventory at Mario Parra's house [with] ammo littered everywhere, in the backyard, home and Parra's car."

The prosecutor highlighted evidence tying Parra to the Inyo Avenue residence, noting that clothing and accessories seen in his social media photos, including a black-and-gray checkered belt, distinctive shoes, and a "Cookies" sweatshirt, were found inside the bedroom associated with him. She emphasized that Parra's vehicles, a Range Rover and an Infiniti, were also located at the residence. Referring to Lopez's testimony, the prosecutor explained that Parra's Infiniti contained "a secret compartment behind the center console," where detectives discovered "a second hidden phone, magazines, money and ammo." The prosecutor also referenced a short-barreled assault rifle linked to counts 8 through 11 and pointed out that it contained ammunition.[16] She concluded, "So in regards to Count 12, all of the elements have been met."

In response, defense counsel briefly challenged Lopez's credibility, noting that Lopez was the sole witness linking Parra to the Infiniti's secret compartment, but did not address the ammunition recovered elsewhere. Counsel also emphasized that, according to Lopez's own testimony, 1309 Inyo was "a headquarters of [DSSM]," frequented by many individuals.

The jury was instructed with CALCRIM No. 2591 on unlawful possession of ammunition, but the trial court did not provide a unanimity instruction. Although there were off-the-record discussions about the jury instructions, on the record, trial counsel raised no objection to the instructions given and made no request for a unanimity instruction on count 12.

### B. *Applicable Law*

Criminal defendants have the right to juror unanimity on issues of fact in criminal trials. (*People v. McDaniel* (2021) 12 Cal.5th 97, 142; *People v. Russo* (2001) 25 Cal.4th

---

[16] Counts 8 and 9 charged Parra with the unlawful possession of a firearm and ammunition during the Olympia Street drive-by shooting, and counts 10 and 11 charged him with the same crimes for the Avon Street home invasion.

1124, 1132 (*Russo*).)  In other words, " 'the jury must agree unanimously the defendant is guilty of a *specific* crime.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877; *Russo*, at p. 1132.)  When the evidence suggests more than one discrete crime under a single count, either the prosecution must elect the act relied upon or the court must instruct the jury to agree on the same criminal act.  (*Covarrubias*, at p. 878; *Russo*, at p. 1132.)

The unanimity instruction exists to prevent jurors from convicting a defendant based on different instances of conduct, thereby ensuring all 12 jurors are convinced beyond a reasonable doubt that the same act constituted the offense.  (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 569 (*Hernandez*); *Russo*, *supra*, 25 Cal.4th at p. 1132.)  It also guards against the risk that jurors may " ' "amalgamat[e] evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict …." ' " (*Hernandez*, at p. 569; *Russo*, at p. 1132.)

A unanimity instruction is required when the record shows evidence of more than one crime that could support conviction under a single count.  (*People v. Grimes* (2016) 1 Cal.5th 698, 727; *People v. Diedrich* (1982) 31 Cal.3d 263, 281.)  But if the evidence shows only a single discrete crime, no instruction is necessary.  (*Russo*, *supra*, 25 Cal.4th at p. 1132.)  The trial court must ask whether there is a genuine risk the jury may split over two discrete crimes, in which case the instruction is required, or whether the evidence merely presents different ways of committing a single crime, in which case it is not.  (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 878; *Russo*, at p. 1135.)

Determining whether a particular instruction was required presents a predominantly legal mixed question of law and fact.  (*Hernandez*, *supra*, 217 Cal.App.4th at p. 568.)  We therefore review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

### C. *Analysis*

In possession cases, a unanimity instruction is required when the evidence shows multiple, distinct acts of possession separated by time, place, or possessory

circumstances. (See *People v. Crawford* (1982) 131 Cal.App.3d 591, 598–599 (*Crawford*); *People v. King* (1991) 231 Cal.App.3d 493, 501–502.)

Here, the prosecutor elected to rely on all of the ammunition recovered on January 3, 2019, from the Inyo Avenue residence, the secret compartment inside the Infiniti parked in the driveway, and the adjacent lot, describing count 12 as based on "ammo littered everywhere, in the backyard, home and Parra's car."[17] Although the prosecutor described count 12 as a single course of conduct encompassing all ammunition recovered during the search, each potential site of possession was supported by distinct factual predicates.

To find Parra guilty based on the ammunition in the Infiniti, jurors had to credit Lopez's testimony linking Parra to that vehicle. To find him guilty based on the ammunition in the backyard, jurors instead had to conclude he exercised constructive possession through his dominion over the premises, even though three other individuals were observed handling the guns and ammunition there. Given these distinct evidentiary foundations, there remained a rational basis upon which jurors could disagree as to which act of possession constituted the offense.

*Crawford*, *supra*, 131 Cal.App.3d 591 is instructive. There, the court held that a unanimity instruction was required where the defendant was charged with a single count of being a felon in possession of a firearm, but the evidence showed four guns located in separate areas of his residence. One gun was found at the foot of the defendant's bed, another in the bedroom closet, and two more in an upstairs bedroom occupied by another person. The defendant and his girlfriend each denied knowledge of some of the guns, and the girlfriend claimed ownership of one. (*Id.* at pp. 594–595.) The prosecutor suggested

---

[17] Thompson inferred that ammunition was inside the 1309 Inyo residence because it was observed being removed from the residence into the backyard. Despite that inference, we could not locate evidence in the record supporting the conclusion that any ammunition was recovered from inside the residence during the deputies' search.

that the two guns in the defendant's bedroom supported the charged offense during his case-in-chief.  (*Id.* at p. 595.)

The appellate court found that while possession was not fragmented in time, it was "fragmented as to space," because the firearms were found in different parts of the residence and the "evidence showed unique facts surrounding the possessory aspect of each weapon."  (*Crawford*, *supra*, 131 Cal.App.3d at pp. 598–599.)  Because jurors could have believed the defendant possessed one gun but not another, the lack of a unanimity instruction created the risk that not all jurors agreed on the same act of possession.  (*Id.* at pp. 596, 599.)

A similar concern exists in this case, where the ammunition was discovered at the same time, but in separate locations under distinct factual circumstances.  This created a risk that the jurors did not unanimously agree on which act constituted possession.  We therefore conclude the trial court should have given a unanimity instruction on count 12.  Nonetheless, we are persuaded that the error in failing to give such an instruction was harmless beyond a reasonable doubt.  (*Chapman*, *supra*, 386 U.S. at p. 24.)

In *Crawford*, the prosecutor presented no unifying theory of possession: four firearms were found in separate rooms, linked to different occupants, and supported by distinct evidentiary circumstances.  The defendant offered separate defenses as to each weapon, claiming ignorance of some, conceding third-party ownership of another, and denying access to others, creating a genuine risk that different jurors relied on different guns.  (*Crawford*, s*upra*, 131 Cal.App.3d at pp. 596, 598–599.)

By contrast, the prosecutor here expressly referred to the ammunition recovered from the Infiniti, and the adjacent lot as part of one cache "littered everywhere, in the backyard, home and Parra's car," and advanced a single theory that Parra possessed all of it.  The defense, rather than offering distinct explanations, denied Parra's possession of any ammunition and attacked Lopez's credibility to undermine the Infiniti link while portraying the residence as a shared gang space.  The jury's guilty verdict necessarily reflects its rejection of that global denial.

The record further establishes that Parra resided at the Inyo Avenue residence. Deputies found a bedroom containing paperwork and personal belongings associated with him, and both his Range Rover and Infiniti were parked outside. Investigating deputies testified that they believed Parra lived there, and social media photos taken inside the residence depicted firearms later recovered during the search. These facts strongly support that Parra exercised dominion and control over the premises and its contents, including the ammunition recovered that day.

Moreover, one of the loaded firearms recovered that day, the short-barreled assault rifle tied to counts 8 and 9, was the same weapon used in the drive-by shooting Parra directed, directly tying the recovered cache to his ongoing criminal conduct. These facts, together with the prosecutor's single overarching theory, the defense's consistent posture, and overlapping evidence of control, distinguish this case from *Crawford* and support the conclusion that any presumed instructional error was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24; *Hernandez*, *supra*, 217 Cal.App.4th at pp. 576–577 [applying *Chapman* to the trial court's failure to give a unanimity instruction sua sponte]; *People v. Thompson* (1995) 36 Cal.App.4th 843, 853 ["[w]here the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless"].)

## XI.   The Sentence Imposed on Count 1 Was Unauthorized

The Attorney General contends, and the record confirms, that the trial court imposed an unauthorized sentence on count 1 by imposing a determinate seven-year term for willful, deliberate, and premeditated attempted murder. By statute, that offense carries an indeterminate life term with the possibility of parole. Because the jury also found true the gang enhancement alleged with this count, Parra was subject to a minimum parole eligibility of 15 years. (§§ 664, subd. (a), 186.22, subd. (b)(5).) The trial court did not strike the premeditation finding under section 1385. Accordingly, the

Attorney General asserts that the sentence on count 1 was unauthorized and must be corrected on remand.

Parra initially argues, based on his claim that the sentence on count 2 was unauthorized, that the trial court intended to strike the jury's premeditation finding under section 1385. We find insufficient evidence in the record to support that assertion. Rather, it appears the court erroneously failed to record the proper sentence for count 1 in the abstract of judgment and minute order. As Parra ultimately concedes, the issue is technically moot because a full resentencing hearing is required on remand. We address the issue only to avoid a potential repetition of the error at resentencing.

### A. *Background*

The jury found Parra guilty of attempted murder on count 1, and found true the premeditation allegation. Although the mandatory prison term was seven years to life, the trial court imposed a determinate term of seven years at sentencing. The abstract of judgment and minute order are consistent with the court's oral pronouncement of judgment, imposing a "[midterm] of seven years …."

### B. *Applicable Law*

"It is well established in California by a long line of decisional authority … that a trial court's failure either (1) to pronounce sentence on a statutory sentence-enhancement allegation based upon a finding by the trier of fact or an admission by the defendant that the allegation is true, or (2) to exercise its discretion—to the extent imposition of the enhancement is discretionary—to either strike the enhancement allegation or impose the enhancement, results in an unauthorized sentence." (*People v. Vizcarra* (2015) 236 Cal.App.4th 422, 432.)

Whether a sentence is unauthorized "presents a pure question of law" we examine de novo. (*People v. Camp* (2015) 233 Cal.App.4th 461, 467.)

### C. *Analysis*

The trial court did have statutory authority under section 1385 to strike the jury's finding of willfulness, deliberation, and premeditation on count 1. Section 664,

subdivision (a) distinguishes between attempted murder that is willful, deliberate, and premeditated, which is punishable by an indeterminate life term, and all other attempted murder, which is punishable by a determinate term of five, seven, or nine years. Courts have long recognized that the premeditation allegation functions as a penalty provision, and therefore a trial court has discretion under section 1385 to strike it "in furtherance of justice." (*People v. Marsh* (1984) 36 Cal.3d 134, 144.)

That discretion, however, is strictly conditioned on compliance with section 1385's procedural safeguards. The trial court must state its reasons for any dismissal orally on the record and enter those reasons in the minutes. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 531–532; *People v. Bonnetta* (2009) 46 Cal.4th 143, 151–152.) The purpose of this requirement is to ensure judicial accountability and to protect against arbitrary or improper dismissals. (*People v. Orin* (1975) 13 Cal.3d 937, 944.) If the court fails to comply with this requirement, the sentence is unauthorized.

Here, the record demonstrates that the trial court did not exercise its section 1385 discretion to strike the premeditation finding. To the contrary, the court expressly stated at sentencing that it would not "exercise any [section] 1385 striking." Nor did the court provide a statement of reasons on the record or in the minutes, as section 1385 requires. Absent such an express and valid dismissal, the premeditation finding remained intact, and the court was required to impose the indeterminate life sentence prescribed by section 664, subdivision (a). The court's imposition of a determinate seven-year term, representing the midterm for nonpremeditated attempted murder, was therefore unauthorized.

On remand, the trial court must impose a lawful sentence on count 1, either by properly exercising its section 1385 discretion to strike the premeditation finding in accordance with statutory requirements, or by imposing the correct indeterminate life term with the applicable enhancements.

## **DISPOSITION**

Parra's sentence is vacated, and the matter is remanded for further proceedings consistent with this opinion.

The jury's findings on the section 186.22, subdivision (b), gang enhancements; the section 186.22, subdivision (a), substantive gang offense; and the gang-related firearm use enhancements under section 12022.53, subdivisions (d) and (e)(1), are vacated in light of Assembly Bill 333. The prosecutor may elect to retry these allegations within 60 days of the filing of the remittitur in the trial court. (§ 1382, subd. (a)(2).)

Parra's conviction on count 2 for attempted voluntary manslaughter is reversed, and the firearm use enhancements imposed under section 12022.53, subdivision (b), attached to counts 4 and 5 are stricken.

Following resentencing, the trial court shall prepare and forward to the appropriate authorities an amended abstract of judgment reflecting all modifications, along with an updated custody credit calculation. In all other respects, the judgment is affirmed.


HARRELL, J.

WE CONCUR:


HILL, P. J.


LEVY, J.